[Cite as *In re H.F.*, 2014-Ohio-3899.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| IN THE MATTER OF: | : | Hon. William B. Hoffman, P.J. |
| H. F. | : | Hon. W. Scott Gwin, J. |
| A. W. | : | Hon. Sheila G. Farmer, J. |
|  | : |  |
|  | : |  |
|  | : | Case No. 2014CA00093 |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil appeal from the Stark County Court of Common Pleas, Case Nos. 2012JCV01093, 2013JCV00779

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     September 8, 2014

APPEARANCES:

For Appellee

QUAY COMPTON
SCJFS
221 Third Street S.E.
Canton, OH 44702

For Appellant

RODNEY A. BACA
SCHNARS, BACA & INFANTINO, LLC
610 Market Avenue North
Canton, OH 44702

*Gwin, P.J.*

{¶1} Appellant-mother, Arionna Freeman ["Mother"] appeals the May 2, 2014, judgment entry of the Stark County Court of Common Pleas, Juvenile Court Division, which terminated her parental rights with respect to her minor children H.F. and A.W. and granted permanent custody of the children to appellee, Stark County Department of Jobs and Family Services ("SCJFS").

### Facts and Procedural History

{¶2} On November 6, 2012, the SCJFS filed a complaint in 2012 JCV 01093, seeking temporary custody of H.F., born August 7, 2012. The complaint alleged the child to be a dependent and/or neglected, and sought temporary custody. After a shelter care hearing on November 7, 2012, the court ordered H.F. into the emergency temporary custody of the SCJFS.

{¶3} On January 10, 2013, H.F. was found dependent and placed into the temporary custody of the SCJFS. The court further found that the agency had made reasonable efforts to prevent the need for removal of the child from the home and approved and adopted the case plan.

{¶4} On May 3, 2013, the trial court reviewed this case. The case plan review packet was approved and adopted and the court made reasonable efforts and compelling reasons findings. The status quo was maintained.

{¶5} On August 3, 2013, Mother gave birth to A. W. On August 7, 2013, SCJFS filed a complaint in 2013 JCV 00779, seeking temporary custody of A.W. The complaint alleged A.W. to be a dependent and/or neglected child and requested temporary

custody. After a shelter care hearing on August 7, 2013, the court ordered A.W. into the emergency temporary custody of the SCJFS.

{¶6} On October 2, 2013, A.W. was found to be a dependent child and was placed into the temporary custody of the SCJFS. The court further found that the agency had made reasonable efforts to prevent the need for removal of the child from the home and approved and adopted the case plan. Also on October 2, 2013, the court reviewed H.F.'s case. The case plan review packet was approved and adopted and the court made reasonable efforts and compelling reasons findings. The status quo was maintained.

{¶7} On January 30, 2014, the court reviewed A.W.'s case. The case plan review packet was approved and adopted and the court made reasonable efforts findings but specifically did not find compelling reasons existed to preclude a permanent custody filing. The status quo was maintained.

{¶8} On March 5, 2014, the SCJFS filed a motion requesting permanent custody of both children.

{¶9} On March 28, 2014, the trial court again reviewed H.F.'s case. The court again approved and adopted the case plan review packet, found that the SCJFS had made reasonable efforts to finalize permanency planning and maintained the status quo pending hearing on the permanent custody motion. The court failed to find compelling reasons existed to preclude a permanent custody finding.

{¶10} On April 14, 2014, both parents filed motions for Extension of Temporary Custody of the children.

{¶11} The following evidence was presented during the evidentiary hearing upon all the pending motions conducted by the trial court on April 24, 2014.

{¶12} SCJFS became involved with the family after H.F.'s birth when Mother tested positive for marijuana. There were additional concerns with domestic violence between the parents. SCJFS attempted to work voluntarily with the parents through the Alternative Response Unit. However, because the parents were failing to follow through with services the SCJFS filed its complaint.

{¶13} The initial case plan was for Mother to obtain and maintain stable housing, complete a Quest assessment, submit to urinalysis or drug testing, establish paternity, complete assessments at Northeast Ohio Behavioral Health, and attend Goodwill Parenting. After court involvement, Mother was pregnant with her second child.

{¶14} A.W. was found to be a dependent child on October 2, 2013 and placed into the temporary custody of the agency. The case plan developed in H.F.'s case was also adopted and made an order of the court in A.W.'s case.

{¶15} During the pendency of this case, Mother had completed her parenting evaluation at Northeast Ohio Behavioral Health and attended Goodwill Parenting. The caseworker testified that Mother's parenting skills were not a concern, as she was able to care for her children.

{¶16} Mother had completed her Quest assessment and they did not recommend any treatment. Mother cooperated with establishing paternity as ordered in her case plan. Mother engaged in Goodwill Parenting in a timely manner and received a certificate of participation. Mother visited beyond what the minimal supervised visitation

was allowed by the Agency. Mother's visitation was always consistent. Mother and children were bonded.

{¶17} Dr. Aimee Thomas from Northeast Ohio Behavioral Health testified that Mother had an average IQ. She further testified that Mother had symptoms of post-traumatic stress disorder and also meets the criteria for major depressive disorder. Dr. Thomas diagnosed her with cannabis dependence even though after Quest evaluations there was no treatment recommended. In spite of the fact the caseworker had testified that Mother appears to be bonded with her children, Dr. Thomas concluded that Mother would have attachment difficulties that could likely translate into a lack of ability to bond with her own children. Dr. Thomas testified that Mother was attending Goodwill Parenting and she appeared to be learning proper parenting methods. Mother reported that she loved going to Goodwill Parenting and she felt it was a way to improve herself.

{¶18} Dr. Thomas further testified that she had concerns that Mother was high risk to reconcile with the father of the children and that she not regain custody unless he also completed case plan services. Dr. Thomas further recommended that, in the event Mother regains custody, she should also engage in home-based services through Goodwill. Dr. Thomas opined that if Mother failed to follow all recommendations, her prognosis would be "poor."

{¶19} Ongoing family service worker Stacey Senff testified that Mother started working with a mentor by the name of Michelle Mungo, who had a very positive effect upon Mother. Ms. Senff testified that the initial concerns at the time the case was opened were not remedied, that being those of drug abuse and domestic violence. However, during cross examination, Ms. Senff testified that Mother has maintained

housing, completed all requirements of Quest, she has participated in random tests that have come back negative, completed her Northeast Ohio Behavioral Health parenting evaluation, completed Goodwill Parenting, and completed the Intensive Parent Child Intervention Program ["IPCI"]. Furthermore, Mother completed the referral at Coleman.

{¶20} Jennifer Fire, who is employed by Goodwill Industries, testified that Mother did very well in the curriculum-based part of the program and completed the majority of her program goals; she increased knowledge on the pretest post-test, was attentive in class, and did well during her visits. Ms. Fire testified Mother was attending to her daughters' needs and completed 14 out of 15 of her program goals while attending Goodwill Parenting. She further testified Mother retained and comprehended the information presented and obtained a good score on her post-test and it appeared that she was able to understand the concepts in the program. Ms. Fire testified the visits between Mother and her child went very well and she was appropriate and attended to her children's needs, bringing the necessary supplies during these visits. Mother's interaction with her children was appropriate and they appeared to be bonded

{¶21} However, Ms. Fire testified that based on Mother's own statements, Ms. Fire continued to have concerns with Mother's ability to choose healthy relationships affecting both herself and her children. Ms. Fire found this especially concerning as Goodwill parenting classes do cover the effects of domestic violence on children and families. Of further concern was Mother's repeated statements that she "was done, she wasn't going back to him, she wasn't going to do that", statements that simply don't ring true in light of Mother's actions. Ultimately, Ms. Fire testified that Mother did complete

the Goodwill program but "it was not successfully" as "she did not make the lifestyle changes that were necessary..."

{¶22} After completion of Goodwill, Mother did enroll and engage in the IPCI program.

{¶23} Mother did not complete her counseling, anger management or domestic violence counseling requirements. Caseworker Stacy Senff testified that she only attended services at Freespace a "couple of times." She testified that Mother had not consistently attended mental health counseling at Coleman.

{¶24} Most concerning was that there were continued concerns that Mother had maintained a relationship with Mr. Williamson, the father of the children, despite several instances of domestic violence.

{¶25} Ms. Mitchell, the initial caseworker for H.F. testified that on February 18, 2013, Mother had gone to a Goodwill class and stated that she had missed the previous day's class because she was involved in an incident of domestic violence with the children's father, Martez Williamson. She stated to the Goodwill instructor that Mr. Williamson had come to her home intoxicated claiming he was hungry and in need of a shower. She felt sorry for him and allowed him in the home. He then refused to leave the home and proceeded to kick her in the stomach although she was pregnant at the time. He then would not allow her to leave the apartment. She was finally able to leave after being held for 12 hours. She went to the hospital and filed a police report. The Goodwill instructor and caseworker worked with Mother that day to get her into a shelter. She did go but was asked to leave after just a few days as she refused to follow

the shelter rules. She failed to follow through with the criminal charges or obtain a civil protection order.

{¶26} Shortly after that incident, the caseworker testified that she had received a call from Mother. Mother was on a SARTA bus and father was on the same bus. Father was threatening and yelling at Mother and she feared for her safety. The caseworker advised Mother to call 9-1-1 and called 9-1-1 herself after disconnecting from Mother. The bus driver also contacted the police from the bus. The driver eventually pulled over the bus as Father was so disruptive that the driver feared for the safety of all the passengers. The police intervened after the bus pulled over and father left the bus with the police.

{¶27} After that date, the caseworker testified that she was transporting Mother to a bus stop. When she neared the bus stop, Father was present and appeared to be waiting for Mother. Mother was texting someone and the caseworker did not feel Mother would be safe being dropped off there. The caseworker then cancelled her appointment to drive Mother home.

{¶28} Finally, on June 27, 2013, the caseworker went to Mother's home and found Mr. Williamson entering Mother's apartment with his own key. Ms. Mitchell found this especially concerning as father had exhibited violent behavior throughout the SCJFS' involvement and had made no effort to complete case plan services. She testified that Father had been arrested for domestic violence in December after the SCJFS file its first complaint. She stated that Father was unable to attend the first few visits and the initial family team meeting in the case after he had assaulted Mother outside the Alliance public library.

{¶29} Caseworker Stacy Senff, who took over H.F.'s case and was the caseworker for A.W.'s case, testified that on October 15, 2013, she accidentally happened upon Mother and Father waiting together at a bus stop in Alliance. Mother admitted later that she had accompanied Father to his Melymbrosia intake appointment later that same day. Ms. Senff further testified that on November 27, 2013, she received a call that Mother and Father were attempting to apply for public assistance and were stating that they lived together and had custody of the children.

{¶30} Ms. Senff testified that H.F. and A.W. are African-American girls. H.F. has no medical or behavioral issues. A.W. has reflux and is on a special formula but is otherwise healthy. The girls are placed together in a foster-to-adopt home. This is a newer home for them as their initial foster placement was an older couple who are not willing to adopt. The girls transitioned to the new home without issue and are doing very well there.

{¶31} SCJFS did look into potential relative placements, a paternal relative and a maternal relative. Neither of those relatives was able to pass a home study and therefore could not be considered for placement.

{¶32} Ms. Senff testified that the girls do know Mother as she has consistently visited. However, they separate easily at the end of visits.

{¶33} Ms. Senff testified that she believes that an order granting permanent custody of the children to the SCJFS would be in their best interests as the girls are thriving in their current placement and parents cannot provide them with a safe, stable, nurturing home.

**{¶34}**  Ms. Mungo testified on Mother's behalf. She stated that she had provided a home and support for Mother during a portion of the case. She observed many visits with Mother and the children and felt that Mother did a good job with them. She believes, based on her observations, that Mother and the children are attached and that she loves her children. She believes that the children should be with Mother. She admitted that Mother does have some issues to work on. On cross-examination, she admitted that Mother has lied to her and that she continued to have contact with Father while residing with the Mungo's. She admitted that even with the Mungo's support, Mother was not completing case plan services.

**{¶35}**  Mother also testified during the best interest phase of trial. She testified that she completed some, but not all, of her case plan services. She admitted that she knew she needed to do domestic violence counseling but that she did not do it because "I was too pregnant and it was too hot to go all the way to Canton from Alliance..." She further testified that she was in a relationship with Mr. Williamson beginning at age 18 but that it has been more than a year since they were involved. This was despite the previous testimony of domestically violent incidents that had occurred, much within the year before trial.

**{¶36}**  On May 2, 2014, the trial court filed Findings of Fact and Judgment Entries, which terminated the parental rights of Mother and granted permanent custody of H.F. and A.W. to SCJFS.

### *Assignments of Error*

**{¶37}**  On appeal, Mother asserts the following assignments of error,

{¶38} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILDREN CANNOT OR SHOULD NOT BE PLACED WITH APPELLANT WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶39} "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I & II

{¶40} Because we find the issues raised in Mother's first and second assignments of error are closely related, for ease of discussion, we shall address the assignments of error together.

**A. Burden Of Proof**

{¶41} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), *quoting Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist.1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id.

**{¶42}** An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

**B. Standard of Review**

**{¶43}** The Ohio Supreme Court has delineated our standard of review as follows,

> Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. See *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526, *Cole v. McClure*, 88 Ohio St. 1, 102 N.E. 264, and *Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14.

*Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

**{¶44}** In *Cross*, the Supreme Court further cautioned,

> The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.* See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

### *C. Requirements for Permanent Custody Awards*

**{¶45}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶46}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶47}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

### 1. Temporary Custody for at least 12 out of a consecutive 22 month period-R.C. 2151.414(B) (1) (d)

**{¶48}** In the case sub judice, the trial court found, pursuant to R.C. 2151. 414(B)(1)(d) that H.F. had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. (Findings of Fact and Conclusions of Law, filed May 2, 2014 at 17). The trial court further stated, pursuant to R.C. 2151. 414(B)(1)(a), that H.F. could not be placed with either parent within a reasonable time.(Id.) Mother challenges only the court's finding that the children, both H.F. and A.W. cannot be placed with her within a reasonable time.

**{¶49}** As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Langford Children*, Fifth District Stark. No. 2004CA00349, 2005-Ohio-2304, ¶17; *In re Dalton*, Fifth Dist. Tuscarawas No.2007 AP 0041, 2007-Ohio-5805, ¶88. Therefore, because Mother has not challenged the twelve of twenty-two month finding, we would not need to address the merits of this assignment of error with respect to H.F. *In re N.D.*, Fifth District Stark No. 2010CA00334, 2011-Ohio-685, ¶27. This finding alone, in conjunction with a best-

interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 5th Dist. No. 2008CA00118, 2008–Ohio–5458, ¶ 45.

**2. Parental Placement within a Reasonable Time- R.C. 2151.414(B) (1) (a).**

**{¶50}** The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E) (1) – (15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. See *In re: William S.,* 75 Ohio St.3d 95, 1996-Ohio-182, 661 N.E.2d 738; *In re: Hurlow*, 4th Dist. No. 98 CA 6, 1998 WL 655414(Sept. 21, 1998); *In re: Butcher*, 4th Dist. No. 1470, 1991 WL 62145(Apr 10, 1991).

**{¶51}** R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear

and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of

this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;

(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.052907.07, 2907.08, 2907.09, 2907.12, 2907.21,2907.22, 2907.23, 2907.252907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12,2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been

convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.

(7) The parent has been convicted of or pleaded guilty to one of the following:

* * *

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section or

2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

{¶52} In the case at bar, the trial court found,

Extensive services were offered to this family to prevent removal, and, after removal, to bring about reunification. The Alternative Response Team attempted to work with Mother and Father in order to prevent the removal of [H.F.] Ms. Mitchell provided bus passes, transportation and housing. After [A.W.] was removed, Ms. Senff continued the efforts started by Ms. Mitchell to reunify the children with Mother. Mother did not want to go to Renew so a referral was made to Freespace. She went three times and has not been back. Mother did not want to go to Guidestone so a referral was made to Coleman Center. Mother had the support of the foster family where the children were placed. In fact, a friend of the foster family, Michelle Mungo invited Mother to live with her family, and she did for a number of months. Mother actually enjoyed more than the normal number of visits because the Mungo family supervised her with the children and modeled good parenting for her. Mother had the benefit of much more community support than most parents who are attempting to reunify. However, Mother was deceitful. She lied about going to school for her GED. The Mungo family stopped their involvement in December 2013. Father did not begin services until after [A.W.]'s birth in August 2013. He was not cooperative with the agency or service providers.

The parents have not remedied the conditions that led to the removal of the children. Both parents allege they have no current relationship. The Court does not find that assertion credible and the

children are in danger of emotional and physical harm if they are in the presence of Father. Mother has done some good work on the case plan. She has not had an easy life, and the Court is very sympathetic to her, but the statute specifically instructs the Court not to consider the effect that granting permanent custody would have upon her. She has not shown an ability to protect the children from Father. She needs counseling to address domestic violence and to help her avoid relationships that recreate her traumatic past. She has avoided that counseling. When asked why, she said it was "too hot and I was too pregnant to come to Canton." That was obviously prior to [A.W.]'s birth nine months ago.

{¶53} As set forth in our statement of facts above, the trial court's findings are based upon competent credible evidence. The record includes the testimony of the witnesses at trial. The trial court was in the best position to determine the credibility of the witnesses. As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. No. CA–5758, 1982 WL 2911(Feb. 10, 1982).

{¶54} The evidence demonstrated the successful efforts Mother had made on the case plan. On that point, the evidence demonstrates that any improvement that Mother has made in her life is tentative and, perhaps, temporary, and that she is at risk of relapse. The trial court found that, regardless of Mother's compliance with aspects of

her case plan, she was still not able and unwilling to take the necessary steps to protect herself and her children from domestic violence from the Father.

{¶55} In the case of *In re: Summerfield*, 5th Dist. No. 2005CA00139, 2005-Ohio-5523, this court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time.

{¶56} Based upon the foregoing, as well as the entire record in this case, the Court properly found both H.F. and A.W. could not or should not be returned to Mother within a reasonable time. Despite offering numerous services, Mother was unable to mitigate the concerns that led to the children's removal.

**D. The Best Interest of the Child**

{¶57} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶58} The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a

grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424(8th Dist.1994). A finding that it is in the best interest of a child to terminate the parental rights of one parent is not dependent upon the court making a similar finding with respect to the other parent. The trial court would necessarily make a separate determination concerning the best interest of the child with respect to the rights of the mother and the rights of the father.

{¶59} The trial court made findings of fact regarding the children's best interest. It is well-established that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re: Mauzy* Children, 5th Dist. 2000CA00244, 2000 WL 1700073(Nov. 13, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424(8th Dist. 1994).

{¶60} As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* 5th Dist. No. CA-5758, 1981 WL 6321(Feb. 10, 1982). "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record, *Miller v. Miller*, 37 Ohio St. 3d 71, 523 N.E.2d 846(1988).

{¶61} In the present case, the trial court's decision indicates it considered the best interest factors. Upon review of the record, it is clear that the record supports the

trial court's finding that granting the motion for permanent custody is in H.F.'s and A.W.'s best interest. The trial court concluded the children's need for legally secure placement could not be achieved without awarding permanent custody to SCJFS

{¶62} The record makes clear that Mother failed to complete necessary portions of the case plan provided by SCJFS and failed to even try to leave or remedy the abusive relationship with the Father.

{¶63} The record does not demonstrate that if she had been offered different case plan services, the result would have been different.

### E. Conclusion

{¶64} For these reasons, we find that the trial court's determination that Mother had failed to remedy the issues that caused the initial removal and therefore the children could not be placed with her within a reasonable time or should not be placed with her was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that the trial court's decision that permanent custody to SCJFS was in the children's best interest, was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶65} Because the evidence in the record supports the trial court's judgment, we overrule Mother's two assignments of error, and affirm the decision of the Stark County Court of Common Pleas, Juvenile Court Division.

By Gwin, J.,

Hoffman, P.J., and

Farmer, J., concur