OPINION *Page 2 
{¶ 1} Appellant, Barbara Dalton, appeals from the June 11, 2007 Judgment Entry of the Tuscarawas County Court of Common Pleas, Juvenile Division, terminating her parental rights.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Barbara Dalton is the biological mother of Lyle Dalton (DOB 8/26/95), Mike Giarratano, Jr. (DOB 7/13/96) and Salvadore Giarratano (DOB 12/18/97). Mike Giarratano, Sr. is their biological father. The two have never been married.
 {¶ 3} Pursuant to a Judgment Entry filed on December 1, 2004, the three children were placed in the temporary custody of the Tuscarawas County Department of Job Family Services.
 {¶ 4} On December 2, 2004, a complaint was filed by the Tuscarawas County Department of Job Family Services (hereinafter "TCDJFS") alleging that the three children were neglected and dependent children. An adjudicatory hearing was held on December 30, 2004. At the hearing, the neglect count was dismissed and the parents entered an admission to an amended complaint alleging dependency. The trial court, in its entry, found the three children to be dependent children and ordered that they remain in the temporary custody of the TCDJFS.
 {¶ 5} Thereafter, on November 6, 2006, SCDJFS filed a motion for permanent custody as the case had reached its statutory sunset date. TCDJFS, in its motion, alleged that the children had been in its temporary custody for a period in excess of *Page 3 
twelve out of the previous twenty-two months. A hearing on the motion was held on April 12, 2007. The following testimony was adduced at the hearing.[1]
 {¶ 6} Betsy Wanosik, a caseworker with TCDJFS, testified that she had been involved with the children's family since June of 2004. While, when she first became involved, appellant and Mike Giarratano were together, Wanosik testified that the two had not resided together for at least a year.
 {¶ 7} Wanosik testified that appellant and Giarratano had been involved with children services agencies since 1997 and that there had been reports of harsh use of physical discipline. Wanosik also testified that the three (3) children had been exposed to domestic violence and were very violent towards one another.
 {¶ 8} When asked about appellant's case plan, Wanosik testified that appellant had completed all of the services on the plan and had done everything that she was asked to do, including, but not limited to, participating in a domestic violence awareness group, undergoing a psychological exam, and maintaining housing and employment.
 {¶ 9} At the hearing, Wanosik testified that all of the children had special needs. She testified that Lyle had been diagnosed with ADHD and Oppositional Defiant Disorder and had problems with stealing, telling lies and violent outbursts. Wanosik testified that Lyle and Mike, Jr. had been in the same foster home with a foster parent who is a caseworker for Job Family Services in another county, since January 13, 2005 and that she had seen a lot of improvement in Lyle during such time. According to Wanosik, Mike, Jr. was diagnosed with ADHD and post-traumatic stress disorder. She further testified that he sometimes engaged in extremely violent behavior and suicidal *Page 4 
behavior and that he was subject to depression and did not deal well with change. Wanosik testified that Mike, Jr. was placed in a psychiatric hospital in 2005 for almost two weeks and could not attend a normal public school. According to Wanosik, Mike, Jr. had progressed while in foster care and appeared to be happier and was less violent.
 {¶ 10} When questioned about all three boys, Wanosik testified that their behavior was "very intense, very, very violent." Transcript at 22.
 {¶ 11} Wanosik also was questioned about Salvadore. Wanosik testified that Salvadore, as of March of 2007, was residing in the same foster home as his brothers. She further testified that Salvadore resided in the same foster home as his brothers from January of 2005 until June or July of 2005, but was placed into a therapeutic foster home after his foster parent was not able to deal with him. Because of Salvadore's violent behavior, in March of 2006, he then was placed at Wooster Christian Children's Home Residential Center until he returned to his foster home in March of 2007. Wanosik testified that Salvadore was very violent and had to be restrained at times.
 {¶ 12} When asked how Salvadore was doing in the foster home, Wanosik testified that he was "maintaining" and "doing okay". Transcript at 26. She further testified that the three boys needed pretty intensive supervision while they were together and that they had to be driven in two separate cars to visitation with appellant. Wanosik further testified that the supervised visits with appellant went "pretty good", but that they were stressful at times.
 {¶ 13} The following is an excerpt from Wanosik's testimony at the hearing: *Page 5 
 {¶ 14} "Q. Do you think she's better able to manage these three children now than when they first came into care?
 {¶ 15} "A. Absolutely.
 {¶ 16} "Q. So you're not at all suggesting she hasn't made some progress here?
 {¶ 17} "A. Not at all.
 {¶ 18} "Q. Okay. However, you know, a trained foster parent has had at least two of these children in his home for a very long time, has continued to struggle to maintain all three of them?
 {¶ 19} "A. Yeah, it's a, it's a struggle with a twenty-four hour day. I know he, you know, he has to stagger bedtimes, he has to, you know, it's a lot, there's a lot of work involved in it.
 {¶ 20} "Q. Does that give you concern about returning these three kids to mom?
 {¶ 21} "A. It does. Um, her, just her ability to work and three boys and all of their needs. They're all going to need to be in counseling regularly, psychiatrists, um, possibly special schools for at least Mikey, um, in addition to, you know, maintaining the house, maintaining her job, it's going to be a lot.
 {¶ 22} "Court: Did you say that her visits have been, uh, supervised the whole time . . .
 {¶ 23} "A. Yes . . .
 {¶ 24} "Court: The kids have been in foster care?
 {¶ 25} "A. Yes.
 {¶ 26} "Court: Okay. *Page 6 
 {¶ 27} "Q. Now, are you concerned at all, if these children go back to mom, what role Mr. Giarratano [the father] might have here?
 {¶ 28} "A. It is a concern. I mean he's obviously still in the area and, you know, I would have no way of knowing whether or not she would allow contact.
 {¶ 29} "Q. Okay." Transcript at 31-32.
 {¶ 30} When asked what should happen to the children, who had been in foster care for over two years, Wanosik testified that they should not go back to appellant. She testified that the children needed permanency and that the foster parent was very attached to them and wanted what was best for them. She testified that the foster parent was a potential adoptive placement for the three boys, who she testified might never get over the damage and trauma done to them by their parents. Wanosik further testified that the boys were intelligent and that they did well in school once their homework was monitored.
 {¶ 31} When Wanosik was asked if appellant had the ability to meet the children's needs in terms of attending therapy and treatment, she testified that it was going to be difficult since appellant did not have a driver's license. Wanosik further testified that, if the children did not have special needs or a history of problems, she probably would have sent them home a long time ago. She testified that she believed it was in their best interest to be placed in the permanent custody of the agency. The following testimony was adduced when Wanosik was asked if anything else could have been done to allow reunification with appellant: *Page 7 
 {¶ 32} "A. I have worked very very hard on this case in every attempt to try to reunify these boys with one or both of their parents and there's nothing that I could even think of to try to, that I didn't do, or didn't try to do.
 {¶ 33} "Q. Do you see any benefit or do you think it would be in the best interest of any of these children individually to parcel them up and try to send one of them home and do something like that?
 {¶ 34} "A. I refuse to make that decision. I, I'm not picking who gets to go home and who gets to sit in foster care. I, it's either all or none for me. I do not want that personal responsibility of picking and the repercussions that could come from that and, you know, why me and why this and I, no.
 {¶ 35} "Q. Okay, and this isn't a case where one of these children has such severe behaviors and the other two don't that, that decision kind of makes itself is it?
 {¶ 36} "A. No.
 {¶ 37} "Q. Okay, would your opinion change about mom's ability to be able to manage one of these children as opposed to two or three?
 {¶ 38} "A. One, probably she could do it, two, maybe, but I'm, I refuse to make that decision.
 {¶ 39} "Q. It's hard to know though at this point, is that right?
 {¶ 40} "A. It's, absolutely, it's very difficult to know." Transcript at 39-40.
 {¶ 41} When questioned by the trial court, Wanosik testified that appellant and Mike Giarratano previously had been charged and convicted in Louisiana after attempting to sell one of the children for $500.00 in order to pay for car repairs, but had been pardoned after serving two (2) years probation. *Page 8 
 {¶ 42} When questioned by the Guardian Ad Litem, Wanosik testified that appellant possibly still had some sort of relationship with Mike Giarratano, the children's father, but that appellant was not always forthcoming with such information. She further testified that, prior to the court's involvement, the children's school contacted her in 2004 about behavioral and hygiene problems. According to Wanosik, as of 2004, at least two of the children were psychologically evaluated and medicated. Wanosik also testified that Mike Giarratano was charged with domestic violence and that appellant was the victim in one case and Mike, Jr. in another.[2] Wanosik indicated that she had concerns about appellant's ability to protect the children from their father. When Wanosik was questioned about the psychological evaluations performed in the case she testified that appellant's psychological exam described appellant as having a "weak resolve." Transcript at 55.
 {¶ 43} During cross-examination by the father's attorney, Wanosik testified that the foster parent provided a more structured environment and that appellant had shown a willingness to structure in a way that had been recommended. She further testified that the children were bonded with appellant and excited to see her. Wanosik also testified that Lyle and Mike, Jr. were bonded with each other, but that Lyle and Salvadore struggled. When asked, she indicated that it was uncertain that Lyle and Mike, Jr. would be able to remain with Salvadore and that the foster parent had not confirmed that he would adopt the three children.
 {¶ 44} Nancy Stevenson, a therapist with Personal and Family Counseling, testified at the hearing that she had been working with appellant on an out-patient basis *Page 9 
since appellant voluntarily came to her in October of 2004 to work on parenting issues and depression. Stevenson testified that she initially saw appellant every other week and then every two weeks and that, as of the time of the hearing, she was seeing appellant once a month to every two weeks. Stevenson further testified that appellant had gone from moderate to severe depression to having only mild depression and that appellant had maintained employment for almost two years. The following testimony was adduced when Stevenson was asked to describe appellant's progress with respect to parenting issues:
 {¶ 45} "A. I would say there's been a vast amount of progress in that area, being able to see the insights that she's developed. Um, specifically understanding how her choices, behaviors, and attitudes influence and affect the children and trying to make some accommodations accordingly. Um, and specifically noticing the individual needs that each of the kids have, that there isn't one specific solution for all three. She seems to have improved a lot in that, um, seems to be planning ahead, thinking about situations where the kids might have trouble, and planning on how she's going to deal with that as opposed to just reacting fright in the moment.
 {¶ 46} "Q. Alright. Do you feel that she has taken responsibility, uh, for what caused the initial removal of her children?
 {¶ 47} "A. Yes. I would say from, in the beginning, um, the depression was at a point where she wasn't really able to see, um, her part in that, and then she went through a grid process where maybe she was accepting, um, even more of her fair share and I think she's come to a balancing point now recognizing what she truly can control in the situation and what's outside of her control." Transcript at 171-172. *Page 10 
 {¶ 48} According to Stevenson, appellant was not attempting to contact or have a relationship with Mike Giarratano. She further testified that she had seen significant progress in appellant's interaction with her children and that she believed that appellant had the ability to put services in place for the children. Stevenson further testified that appellant no longer needed to take medication for anxiety or depression and that appellant had been compliant with the psychiatrist and continued seeing him on an as needed basis.
 {¶ 49} On cross-examination, Stevenson testified that she had not met with any of the children or assessed them, but that she believed that appellant had the ability to deal with the children's special needs. When asked by the trial court whether there was an over ten year history of appellant allowing the children to be physically, emotionally and mentally abused by their father, Stevenson answered in the affirmative.
 {¶ 50} The next witness to testify at the hearing was Dr. Janice Craig, a child and adolescent psychiatrist with New Horizons. Dr. Craig testified that she worked with appellant and the three children in family therapy. Dr. Craig testified that she began working with Mike, Jr. in April of 2005, Lyle in October of 2005 and Salvadore in March of 2007. She further testified that she met with appellant and the boys on a monthly basis since June of 2006.
 {¶ 51} According to Dr. Craig, Lyle was diagnosed with ADHD and oppositional defiant disorder and takes medications, including medication for his aggression. She testified that he has done well on the medications and that his outbursts were less frequent. She testified that she believed that Mike, Jr. has bipolar disorder and ADHD and had post-traumatic stress disorder, which was resolved. Dr. Craig testified that *Page 11 
Mike, Jr. takes lithium for his bipolar disorder and abillify for his aggression and that Salvadore is on a low dosage of abillify for his aggression.
 {¶ 52} Dr. Craig further testified that appellant's participation in treatment and therapy with the children had had a positive impact and that the children enjoyed their visits with their mother. The following testimony was adduced when she was asked if they should be reunified with appellant:
 {¶ 53} "A. Um, well, I think their attachement has grown again over this time period and there's, un, many reasons why, I mean it's multi-factorial, and there's like conditions upon it in a sense, but I believe that would be in their best interest to be eventually to try reunification with their mother, yes.
 {¶ 54} "Q. Alright, and what conditions do you feel should be put in place if the children were returned to their mother?
 {¶ 55} "A. Well I think because of their disorders one would have to maintain, um, therapy, obviously so, um, home based initially and then ongoing therapy. Um, I would also believe that since their father has not been a part of any of these issues that, um, Barb [appellant] would need to stay separate from the father, that he should not be in the home or having contact with the boys. Um, I also believe that they should continue to see me for awhile even though that's a hardship, but when you know the situation already to start new is difficult, where if somebody worked with before you can see if things are deteriorating or not and, um, but Children's Services should stay involved in terms of supportive interventions and protective orders just to be able to be sure everything is going smoothly. *Page 12 
 {¶ 56} "Q. Alright. Now in your work with the family, and particularly with my Client, do you feel that even if there were no Court orders ordering her to be involved in services that she would continue to stay involved with services for herself and for the Children?
 {¶ 57} "A. From our conversations I would believe she would.
 {¶ 58} "Q. Alright, and how would you describe her overall, uh, investment in the therapy, was she totally invested?
 {¶ 59} "A. I would say she's very invested." Transcript at 197-198.
 {¶ 60} When asked, Dr. Craig testified that she thought it was possible to raise children, such as Mike, Jr., with mental illnesses in the home. She further testified that she believed it was in the children's best interest to be returned to appellant with certain conditions in place, including having continued support systems in place. She testified that the children would need long term psychiatric care in varying degrees and that it would be harmful to them if they bounced from foster home to foster home. According to Dr. Craig, the children's behavior would deteriorate if they are not returned home because of their attachment to their mother.
 {¶ 61} When questioned by the trial court, Dr. Craig testified that the foster home had been a good placement for the children and that they had progressed while in the home. She further testified that the ideal situation would be for things to continue as they were with possible reunification with appellant down the road.
 {¶ 62} At the hearing, Adam Baker, who was Salvadore's therapist, testified that he had been working with appellant and Salvadore since September of 2006. He testified that it was in Salvadore's best interest to be returned to his mother and that *Page 13 
Salvadore made more progress when appellant was involved. The following is an excerpt from Baker's hearing testimony:
 {¶ 63} "Court: Well, uh, our continuing question seems to be this, Sir, my continuing questioning, I guess, continues to be this. Do you think it's in his best interest to be reunified in his mother's home immediately, and I mean right now immediately, uh, without any mandated services at all where she's concerned? Is that in his best interest?
 {¶ 64} "A. I would not say that. I would say that it would be in his best interest if there were mandated services such as counseling, case management, other home based interventions as well.
 {¶ 65} "Court: That you would have concerns without the mandate, mandated services then?
 {¶ 66} "A. I believe they're necessary." Transcript at 234-235.
 {¶ 67} At the hearing, the parties stipulated that if Melinda Caldwell, who supervised visits between appellant and the children, testified, she would testify that appellant acted appropriately during visitation. They further stipulated that if Dr. Conrad, appellant's psychiatrist, testified, he would testify that appellant was fully compliant with him, attended all of her appointments and that she was no longer on medication for depression.
 {¶ 68} Pursuant to a Judgment Entry filed on June 11, 2007, the trial court found that the children should not and could not be placed with either parent within a reasonable time and that the parents had failed continually and repeatedly to substantially remedy the conditions causing removal. The trial court ordered that the *Page 14 
children be placed in the permanent custody of the TCDJFS and that all parental rights be terminated.
 {¶ 69} Appellant, on July 10, 2007, filed a request for findings of fact and conclusions of law. In a supplemental Judgment Entry filed on July 11, 2007, the trial court stated, in relevant part, as follows:
 {¶ 70} "These boys have been placed in a therapeutic foster home in which their foster father is a caseworker for Job and Family Services in another county.
 {¶ 71} "Even though their foster father is experienced, mature, insightful, and incredibly patient, he is greatly challenged by these boys on a day-to-day basis.
 {¶ 72} "Barbara Dalton has spent many years in an abusive relationship with Mike Giarratano, Sr. during which she was in his complete control. During this time, she demonstrated no ability to protect her children and at least passively condones the abuse they suffered.
 {¶ 73} "She finally began complying with her case plan in earnest and has made significant progress in her own emotional health. She has begun to show substantial insight into the relationship she had with Mike Sr. The court has no doubt that some of the progress she has made will be permanent.
 {¶ 74} "Barbara Dalton is very bonded to her children and her sons wish to continue having a relationship with her. Perhaps in the distant future she may be ready to parent these children in a safe manner, although her psychological evaluation characterizes her resolve as `weak at best.' However, the needs of these children continue to exist and cannot be put on hold while their parents attempt to improve. *Page 15 
 {¶ 75} "Statutorily, time has run out in this case, and the Court is now left with the option of returning the children to a parent or placing them in the permanent custody of TCFJFS.[3]
 {¶ 76} "The Court finds that these children have been in foster care for at least 12 of the last 22 months.
 {¶ 77} "Considering all factors in ORC 2151.414, the Guardian Ad Litem's report, and all evidence before the Court, the Court finds it is in the best interest of each child in this case to be placed in the permanent custody to Tuscarawas County Job and Family Services."
 {¶ 78} Appellant now raises the following assignment of error on appeal:
 {¶ 79} "THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO JOB AND FAMILY SERVICES; AS JOB AND FAMILY SERVICES FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT A GRANT OF PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILDREN AND THAT THE CHILDREN COULD NOT OR SHOULD NOT BE PLACED WITH THE MOTHER WITHIN A REASONABLE PERIOD OF TIME; AND THE DECISION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."
 I {¶ 80} Appellant, in her sole assignment of error, argues that the trial court's findings that the children could not or should not be placed with the mother within a reasonable time and that the grant of permanent custody was in the children's best interest were against the manifest weight and sufficiency of the evidence. We disagree. *Page 16 
 {¶ 81} Revised Code § 2151.414(B)(1) addresses under what circumstances a trial court may grant permanent custody. This statute provides as follows:
 {¶ 82} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 83} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 84} "(b) The child is abandoned.
 {¶ 85} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 86} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 87} In the case sub judice, the trial court found, pursuant to R.C. Section 2151.414(B)(1)(d), that the children had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. The trial court further stated, pursuant to R.C. 2151.414(B)(1)(a), the children could not be placed with either parent within a reasonable time. *Page 17 
 {¶ 88} As findings under R.C. Section 2151.414(B)(1)(a) and R.C. Section 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. In re Langford Children, Stark App. No. 2004CA00349,2005-Ohio-2304, at paragraph 17. We conclude the trial court's finding that the children had been in temporary custody a period of time in excess of twelve of the prior twenty-two months with regard to this issue is not against the manifest weight or sufficiency of the evidence. As is stated above, the children were placed in temporary custody on December 1, 2004, and remained in temporary custody at the time TCDJFS filed its motion on November 6, 2006.
 {¶ 89} As is stated above, appellant also argues that the trial court's finding that it was in the children's best interest that permanent custody be granted to TCDJFS was against the manifest weight of the evidence.
 {¶ 90} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, 1982 WL 2911. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. CE. Morris Co. v. Foley Construction (1978),54 Ohio St.2d 279, 376 N .E.2d 578.
 {¶ 91} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the *Page 18 
child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 92} In the case sub judice, testimony was presented at the hearing that the children had been in foster care for over two years and were currently doing well in the same foster home. At the hearing, there was evidence that the foster parent, who is a caseworker in another county, struggled to maintain control over the children. Testimony also was adduced that all of the children have behavioral problems, including angry and aggressive behavior and that they had improved significantly while in foster care. Elizabeth Wanosik, the on-going case worker, testified that she did not believe that the children should be returned to their mother because of their significant behavioral and mental health problems. There was testimony before the court that these problems stemmed from the over ten year history of appellant allowing the children to be physically, emotionally and mentally abused by their father. It is significant to note that appellant's visits with the children have all been supervised.
 {¶ 93} In addition, Dr. Craig, who testified on behalf of appellant, testified that the ideal situation would be for things to continue as they were with possible reunification with appellant down the road. Moreover, Adam Baker, Salvadore's therapist, testified that it was not in Salvadore's best interest to be reunified with appellant immediately *Page 19 
without any mandated services such as counseling, case management or other home-based intervention.
 {¶ 94} Finally, we note that the Guardian Ad Litem, in her April 12, 2007, report, indicated that she believed it was in the children's best interest to be placed in the permanent custody of the agency. The Guardian Ad Litem, in her report, noted that the children had "suffered incredible trauma at the hands of their parents that resulted in deep scaring."[4] The Guardian Ad Litem also voiced her concerns that appellant might not be able to manage the children for longer, supervised periods of time as well as concerns that appellant still maintained contact with the children's father despite the harm he had caused her and the children in the past. Moreover, the Guardian Ad Litem, in her report noted that the greatest concern was ensuring that the children were in a safe environment and that it was her belief that "this can best be guaranteed by a grant of permanent custody to the agency."
 {¶ 95} Based on the foregoing, we find that the trial court's finding that it was in the children's best interest that permanent custody be granted to Tuscarawas County Department of Job Family Services was not against the manifest weight of the evidence. *Page 20 
 {¶ 96} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 97} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division is affirmed.
 Edwards, J. Gwin, P.J. and Farmer, J. concur. *Page 21 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant.
[1] At the hearing, Mike Giarratano was not present. His attorney indicated that she had not had contact with him since October of 2006.
[2] Mike Giarratano pleaded guilty to a charge of domestic violence against Mike, Jr. in June of 2004 and previously had been charged with domestic violence against appellant in May of 2003.
[3] The agency did not request planned permanent planned living arrangement [PPLA] as an alternative to permanent custody.
[4] The Guardian Ad Litem noted that the children's behavior suggested that the abuse had been extensive. *Page 1