[Cite as *In re M.S.*, 2019-Ohio-3076.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| IN THE MATTER OF: | : | JUDGES: | |
| | : | Hon. W. Scott Gwin, P.J. | |
| M.S and L.S., | : | Hon. Craig R. Baldwin, J. | |
| | : | Hon. Earle E. Wise, J. | |
| DEPENDENT CHILDREN | : | | |
| | : | Case No. CT2019-0022 & | |
| | : | CT2019-0023 | |
| | : | | |
| | : | O P I N I O N | |

CHARACTER OF PROCEEDING:      Appeal from the Muskingum County
                              Court of Common Pleas, Juvenile
                              Division, Case Nos. 21630183 &
                              21730050

JUDGMENT:                     Affirmed

DATE OF JUDGMENT:             July 29, 2019

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant R.S.

D. MICHAEL HADDOX                         MICHAEL J. CONNICK
Prosecuting Attorney                      Michael J. Connick Co., LPA
Muskingum County, Ohio                    301 Main St., Suite H
                                          Zanesville, Ohio 43701
By: GERALD V. ANDERSON II
Assistant Prosecuting Attorney
Muskingum County, Ohio
27 North Fifth St., P.O. Box 189
Zanesville, Ohio 43702-0189

*Baldwin, J.*

{¶1} Appellant R.S. appeals from the February 27, 2019 Entry of the Muskingum County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of M.S. and L.S. to Muskingum County Children Services (MCCS).

STATEMENT OF THE FACTS AND CASE

{¶2} Appellant R.S. is the biological mother of M.S. (DOB 11/18/2011) and L.S. (DOB 4/6/2017). On December 1, 2016, MCCS filed a complaint alleging that M.S. was a dependent child. On the same date, a Guardian Ad Litem (GAL) was appointed. Following a shelter care hearing on December 2, 2016, M.S. was placed in the temporary custody of the Agency.

{¶3} On March 24, 2017, prior to L.S.'s birth, appellant was arrested for causing a disturbance at a local gas station. She was jailed for disorderly conduct and tested positive for methamphetamines.

{¶4} On February 27, 2017, the trial court held hearings for adjudication and disposition. M.S. was found to be a dependent child and the trial court ordered that she continue in the temporary custody of MCCS. The trial court further ordered that visitation between M.S. and her mother would be at the discretion of the Agency.

{¶5} On April 7, 2017, MCCS filed a complaint alleging that L.S. was a dependent and neglected child. As memorialized in an ex parte order filed on April 7, 2017, L.S. was placed in the temporary custody of MCCS. On June 26, 2017, L.S. was found to be a dependent child and the trial court ordered that she remain in the temporary custody of the Agency. The State dismissed its allegation of neglect.

{¶6} On July 6, 2018, MCCS filed a Motion for Permanent Custody of the two children. A hearing on the motion was held on November 20, 2018.

{¶7} At the hearing, Gary Wolfgang, Ph.D. testified that he was a psychologist and clinical counselor and that he did a psychological evaluation on R.S. The following testimony was adduced when he was asked what conclusions he drew from her ability to parent:

{¶8} A. Well, I found that there were significant limitations based on her mental health issues and presentation in the interview. She has - - she had a long-standing history of methamphetamine abuse that had been five years in duration. She was reportedly clean from that drug at the time we met, but she would seem to meet the criteria for bipolar disorder, personality disorder, potentially ADHD, and she had multiple symptoms over the course of our interview time. She had a very great deal of difficulty with the process.

{¶9} Q: But you were able to complete the evaluation; correct?

{¶10} A: Yes.

{¶11} Q: And what - - did you draw any other conclusions concerning her?

{¶12} A: Well, you know, those diagnoses that I've already stated. She reported at the time she was out of work except for a workshop that she was working as part of the mental health center. She didn't have a place to live. She was homeless at least at that time.

She had very little in the way of a support system. She talked about an individual who was her support system who she admitted had either raped her or had exploited her sexually.

She was refusing psychotropic medications that had previously been prescribed by two different providers and found to have been necessary for her care, and there were a wide range of significant concerns found.

**{¶13}** Transcript at 7-8. Dr. Wolgang opined that appellant needed the medications and also needed a job and a home and needed to be clean from her substances. As of the second of their three appointments, appellant had not yet enrolled in a rehabilitation program. Based on the "severity of her really lifelong history of mental health and behavioral difficulties", Dr. Wolfgang believed that even with treatment, appellant's prognosis was "guarded to poor." Transcript at 9. His report was admitted as an exhibit. When asked, it stated that this evaluation was done with psychological certainty.

**{¶14}** On cross-examination, Dr. Wolfgang testified that a crisis center through Allwell could provide appellant with some of the services that he thought were necessary. The last time that Dr. Wolfgang saw appellant was on May 17, 2017.

**{¶15}** The next witness to testify was Kelly Lee, a counselor at Muskingum Behavioral Health (MBH). She testified that she had seen or worked with R.S. and that due to R.S.'s mental state, they put her in outpatient treatment. According to Lee, appellant attended 10 sessions and missed 13 and was still in the program. Appellant's last attendance was on November 1, 2018 and appellant had started in February. Lee testified that appellant was usually supposed to be attending weekly sessions but that sometimes "it goes a little bit longer", but that appellant had not been there weekly and had missed 13 individual and 5 group sessions. Lee testified that she was counseling appellant for addiction and that appellant had a "severe amphetamine diagnosis, mild

cannabis and mild alcohol." Transcript at 21-22. According to Lee, most of the counseling sessions were not productive, but she had seen positive changes the last two.

{¶16} On cross-examination, Lee testified that appellant had been assessed twice at the agency but she was not involved with appellant's treatment both times. She indicated that she had been involved with treatment since February of 2018 and testified that appellant had a group counselor, Karen Seward. Since February of 2018, appellant had been subjected to testing for drug use but had only two tests. Lee testified that appellant was required to give a sample on April 16, 2018 but left before providing one and that on November 13, 2018, appellant had a negative drug test. Lee testified that she had seen appellant on October 7, 2018 and that appellant was doing remarkably better and that when she saw appellant on November 1, 2018, appellant was doing well.

{¶17} When questioned about appellant's thought processes on April 10, 2018, Lee testified that they were disorganized and erratic and that the agency had called the police on April 10, 2018. In contrast, in October of 2018, appellant was willing to discuss addiction, was conversant and pleasant and the two were able to have a rational dialogue. Kelly indicated that she believed the difference between the two interviews was partly due to the improvement in appellant's mental health illness and substance abuse addiction.

{¶18} When appellant met with Lee on October 17, 2018, appellant told her that she had been staying at the Life Well shelter and was in a better environment, that she had a team meeting at Allwell, and that doctors were working on straightening out her medications. Lee testified that Allwell was a mental health behavioral agency that treats mental health issues. Appellant also told Lee that she was drug free and, at a meeting on November 1, 2918, told Lee that she had been drug free for 60 days and was at the crisis

center. Lee agreed that in the last 60 days, appellant had actively sought out the type of treatment and assistance that she needed to cope both mentally and with her substance abuse addiction.

{¶19} Lee told the court that the agency had been involved with appellant twice and that she did not do the prior assessment or treatment. Appellant's prior assessment was on June 14, 2017 and her last day of service there was about July 3, 2017 due to nonattendance. Following appellant's assessment in February of 2018, appellant qualified for intensive outpatient treatment, but the recommendation was for non-intensive outpatient treatment due to appellant's mental health state at that time. Lee testified that they did not believe that appellant was stable enough to be in group sessions that many times (4 to 5) a week. During her assessment, appellant "had delusional thoughts, flight of ideas, rapid speech and presented as restlessness." Transcript at 36. Appellant also reported being homeless and unemployed and struggled with transportation. Lee told the court that during the last two appointments, appellant had told her that she was at the crisis center and was going to start at CORE, a work program through Allwell.

{¶20} The trial court asked Lee why there was a gap between appellant's April 10, 2018 and October 4, 2018 treatment. Lee testified that appellant had missed several sessions. She testified that appellant was not drug tested at other times due to her instability and erratic behavior.

{¶21} On redirect, Lee testified that on May 29, 2018, appellant missed an appointment after calling and saying that she was going to Clearview to detox. Because appellant did not reschedule the appointment, there were no appointments between May and August. From August 2018 to October 2018, appellant attended two appointments in

October. While appellant made an appointment for August, she did not show up. On recross, Lee testified that appellant had progressed at the last two sessions and that if she continued progressing, she was going to put appellant in intensive outpatient treatment. Appellant had been in intensive group treatment before, but it did not work out. Appellant attended group sessions on February 27, 2018, March 6, 2018, but did not show on March 13, 2018, canceled on March 20, 2018 and did not show on March 27, 2018. Appellant attended again on April 3, 2018. Lee testified that she removed appellant from the group for not participating. She testified that appellant, at the last two sessions, had presented with the desire to be drug-free.

{¶22} Chari Roberts, a therapist with Mid-Ohio Behavioral Health, testified that she was M.S.'s therapist.  She testified that M.S. was being treated for a disruptive mood dysregulation disorder and was not trusting.  Roberts testified that M.S. was starting to improve her behaviors in her current placement. The next witness to testify was Ashley Labaki, who used to be a caseworker for appellant and the two children. She testified that they were never able to establish paternity for L.S. and that M.S.'s alleged father did not want to pursue custody of her. Labaki testified that she received the case in November of 2016 and that appellant's case plan objectives included housing and income management objectives. She also testified that the case plan had mental health objectives and substance abuse objectives for appellant. Labaki testified that appellant's performance on her case plan objectives "varied" and that at times, appellant did have housing and was working while at other times, she lost contact with appellant for over a month and did not know where appellant was or how she was doing. Transcript at 60. Appellant was expected to do drug screens regularly, but would not come in for screens

for long periods of time. While appellant had housing, she ended up losing her housing shortly after obtaining it due to lack of finances. Labaki also testified that appellant had been arrested for disorderly conduct and placed in the city jail before L.S. was born.

**{¶23}** After L.S. was born, appellant would get into treatment, but would either leave the facility or stop going to treatment. Labaki testified that she had worked with appellant for not quite two years before leaving the agency. She testified as follows when asked if appellant had made enough improvements to be partially or somewhat completing her case plan:

**{¶24}** A. Unfortunately not. [R.S.] made attempts to get her treatment started, to get into rehabilitation facilities on her own. She has tried to locate employment. She, as I previously testified to, did obtain housing, that if she had maintained it might have been appropriate for children there as well.

However, I think as much as she tried, she just, unfortunately, has not been able to complete treatment. She hasn't been able to manage her mental health following all recommendations from mental health counselors and hasn't been able to maintain housing or enough income to provide for these kids.

**{¶25}** Transcript at 64.

**{¶26}** On cross-examination, Labaki testified that appellant had both substance abuse and mental health counseling and that appellant was in and out of counseling. She testified that appellant went to Allwell and then stopped attending her appointments and would come in for drug screens for a short period of time and then would quit doing so. She testified that appellant did not have support out in the community other than what

she got from other institutions or facilities throughout the case. Appellant, according to Labaki, had pretty severe mental health symptoms.

**{¶27}** Labaki testified that during an incident on June 13, 2017, appellant was behaving very erratically during visitation with L.S. and it was determined that it was in L.S.'s best interest not to have visitation. She did not believe that here had been visitation since that time. Labaki testified that the two children were doing very well in their foster home placement and were meeting milestones. She testified that M.S.'s mental health had improved and that M.S. was not as aggressive and was becoming very social. While the agency had investigated kinship placement options for both children, the options did not pan out.

**{¶28}** According to Labaki, a big component of appellant's mental health treatment was medication and appellant "was adamant that she did not want to take it." Transcript at 77. She testified that the agency attempted to stabilize appellant's mental health situation, but that appellant never got stable enough to see L.S. Appellant had not seen M.S. either based upon counselor recommendations for M.S.'s mental health. Labaki testified that appellant had not seen M.S. for nearly two years and had not had M.S. in her custody for several years. M.S. had been with her maternal great- grandmother and when she passed away, had stayed with her grandfather who later relinquished physical custody of her. M.S. then went into foster care. M.S. did not remember her mother's name or what she looked like.

**{¶29}** When asked by the court, Labaki testified that appellant attended a mental health assessment at Allwell Behavioral Health on June 13, 2017 and attended four appointments and missed appointments in May, July and August. Appellant's last

appointment at Allwell was on September 17, 2017 and Labaki testified that appellant did not successfully complete it. Appellant also went to Cambridge Behavioral Health, an inpatient facility psychiatric unit, in the summer of 2017 after having herself admitted there. When Labaki went there about a month after appellant had been admitted here, she was told that there was no one there by appellant's name. Appellant went to Stanton Villa, which combines mental health and substance abuse treatment, on May 9, 2017 but was unsuccessfully discharged on May 11, 2017 and left against their recommendations. Appellant was discharged due to her disrespectful and rude behavior towards staff and other patients. Labaki further testified that appellant had an assessment at MBH on June 14, 2017 and "then she left shortly after that as well. She did not successfully complete." Transcript at 86. Appellant's last appointment was on July 3, 2017. Labaki testified that appellant was asked to do drug screening through the agency, but did not attend consistently. Appellant had screens on April 13, 2017, April 18, 2017, April 20, 2017, April 24, 2017, April 27, 2017, May 1, 2017, May 3, 2017 and May 18, 2017 and then went to Stanton Villa when she was unsuccessfully discharged on May 11, 2017. Appellant's had screens on June 14, 2017, June 19, 2017 and June 21, 2017 which were positive for methamphetamines and her screens on August 24 and 28, 2017 were negative. Appellant did not attend any other screens although Labaki testified that she was supposed to. Labaki also testified that many months she was unable to locate R.S. or R.S. was unwilling to meet with her. Appellant told Labaki that she did not have a ride so the agency provided her with bus passes. She also testified that the agency attempted to help appellant get into different shelters and that while appellant obtained an apartment without any help, she ended up losing it for financial reasons. When asked by the court,

Labaki testified that it was in the children's best interest for permanent custody to be granted to the agency. She voiced concerns that while appellant tried, appellant would not be able to "maintain long enough to safely raise these children." Transcript at 96. Appellant would do well for a month or two months, but it never lasted. Appellant had never completed the part of her case plan requiring her to obtain a residence.

{¶30} Lynsey Yarger, a caseworker with Muskingum County Adult and Protective Services, testified that she took over the case on September 1, 2018 after Ashley Labaki left the agency. She testified that she was unable to locate appellant at that time and that appellant came to their office the beginning in of October of 2018. Appellant had called Yarger in September and told her that she was at Cambridge Behavioral Health Hospital, but when Yarger went there on September 27, 2018 to see appellant, she was told that appellant had left and had not signed a release for her records. In October of 2018, appellant was living at a homeless shelter and later moved to the Allwell shelter. However, when Yarger tried to contact Allwell to get an update on appellant's progress, she was told that appellant had not signed a release. Yarger testified that she had asked appellant a couple of times to sign a release and that appellant did sign a release for MBH, but not for Allwell. Appellant, Yarger testified, still did not have housing but was working at CORE. Yarger testified that appellant had not completed any of her case plan objectives, but was making progress on them. She testified that appellant started attending appointments at MBH and did drug screens. Appellant's drug screens in October and November were negative.

{¶31} Yarger testified that the children were doing extremely well in a foster home and that M.S. was in counseling and on medications. M.S. was doing well in school and

was very outgoing and bright. L.S. was walking and could feed herself with her hands. She testified that M.S. was very fragile emotionally and that she had had been in the custody of the agency for nearly two years while L.S. had been in the custody of the agency for about a year and a half. Appellant had not visited the children since Yarger took over the case plan. She testified that it was in the children's' best interest for permanent to custody to be granted to the agency.

{¶32} While Yarger admitted on cross-examination that no mental health professional had ever told her that appellant was psychotic or suffered from a mental health illness that made her a danger to herself or others, she testified that they did not have releases to allow them to talk to Yarger. Yarger testified that she had had only one face-to-face meeting outside the court with appellant in October 2018.

{¶33} After the State rested, appellant testified that she had been involved with Children Services for approximately two years and that she had kept up with her drug testing. She further testified that she completed an inpatient program at Cambridge and went away to a place for rehab and mental health. She testified that she was working on her case plan. According to appellant, she decided to go to Cambridge by herself while receiving service through Allwell.  At the time, appellant was in a transitional house through Allwell after losing her apartment. She testified that she had been in Cambridge in the past and that they admitted her. While at Cambridge, she was prescribed medication for her mental health and she testified that she did not refuse to take any prescribed medication. Appellant also had a counselor for her mental health and kept all of her appointments with the counselor. Appellant also received substance abuse counseling in classes and in groups. Appellant testified that she was at Cambridge for

almost a month and left with the "consent of the facility and Allwell on the outside." Transcript at 134.

**{¶34}** After leaving Cambridge, appellant slept in a tent for two days at Larry's until she could get into the shelter at Life Well. Appellant had had problems with Larry in the past and there was testimony that he was mean to her and had used her sexually. She stayed at Life Well for two or three weeks and while there walked to Muskingum Behavioral Health for appointments. Appellant testified that she resided at the crisis center and that she went into the crisis center on October 21, 2018. She testified that she received her medication daily and had seen her mental health counselor twice since then. She testified that they had set her up with a job at CORE Enterprises doing light assembly and manual labor and that she started there on October 22, 2018 and worked four days a week. Appellant indicated that she was still going to MBH and planned on starting group counseling. She testified that she was currently active in substance abuse treatment and in her mental health treatment and medication. According to appellant, she was opening up a bank account to save money and looking for a job that paid more so that she could afford housing. Appellant agreed that when the case started, she had significant mental health problems and a significant substance abuse addition to methamphetamines. She further agreed that she had no family members supporting he since her case started. Appellant asked the court to grant her visitation between the time of the hearing and the time that the court made its final order.

**{¶35}** On cross-examination, appellant admitted that she had started working at CORE within the last 30 days and had just received one paycheck and that she did not have her own housing. She testified that while she had not completed any of her case

plan objectives, she was working on them. She testified that while she had worked on her case plan before for a while and then stopped, she had a lot more support and was able to keep rides and have a place to stay. She testified that she did not remember to sign any release for Allwell, but was going to do so. Appellant also admitted that M.S. had been out of her custody for about five years since November 21, 2013 and that while M.S. was living with appellant's father, appellant did not have visitation in part because she was in jail for underage consumption and for failing to make it to her probation officer and in part because he father refused to let her see her daughter. Appellant testified that she had been sober for three and a half months and had been in in-patient rehab just once prior to her involvement in this case.

**{¶36}** The court asked appellant about M.S. Appellant testified that her grandmother got custody of M.S. in 2013 after she gave her grandmother temporary custody of M.S. while appellant moved out of town over concerns for her safety. Appellant testified that her medicine was stabilized and that she had been at Cambridge Behavioral Health three times within a year and a half period. She testified that she was receiving job training.

**{¶37}** At the hearing, the Guardian ad Litem told the court that while appellant had made a lot of progress, she was still supporting the agency's motion and that "time-wise we are in a predicament." Transcript at 170. In the Guardian's Noemebr 20, 2018 report, the Guardian indicated that the minor children had permanency and stability in their foster home and that appellant had made minimal progress on her case plan.

**{¶38}** The trial court, pursuant to an Entry filed on February 27, 2019, terminated appellant's parental rights and granted permanent custody of the two children to Muskingum County Children Services.

**{¶39}** Appellant now raises the following assignment of error on appeal:

**{¶40}** "I. THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I

**{¶41}** Appellant, in her sole assignment of error, argues that the trial court's decision to grant permanent custody to the agency was against the manifest weight of the evidence. We disagree.

**{¶42}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA-5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d

172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley* at ¶ 21. While we review the evidence and consider witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20.

**{¶43}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶44}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

**{¶1}**   (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the

child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

**{¶2}** (b) the child is abandoned;

**{¶3}** (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

**{¶4}** (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶45}** We first note the trial court determined, in part, that, pursuant to R.C. 2151.414(B)(1)(d), the children had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. Appellant does not contest such finding. As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni,* 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008-Ohio-5458

**{¶46}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including,

but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶47}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶48}** Appellant argues that the trial court relied on inadmissible hearsay evidence contrary to Rule 34 (I) of the Ohio Rules of Juvenile Procedure in granting permanent custody. Appellant first argues that the trial court erred in considering the report of Dr. Wolfgang when the written report of an expert witness is not admissible evidence.

**{¶49}** However, at the hearing, appellant's counsel stated that he did not necessarily object to the admission of Dr. Wolfgang's report, but rather to his testimony regarding his opinion. When asked why, appellant's counsel indicated as follows:

**{¶50}** THE COURT: In what way? I'm not following you.

**{¶51}** MR. VAN HORN: Well, there are specific questions that are addressed in the report. There are certain standards that need to be met with regard to an opinion of

an expert, and I don't think those have been met yet and I don't think the report should or could be used to do that.

**{¶52}** THE COURT:  Mr. Dick.

**{¶53}** MR DICK:  Well, Your Honor, I certainly - - I asked him if that was his report, and he stated yes. I certainly will ask him if it is made with psychological certainty and stuff to - - (INAUDIBLE) - - I know he testified and he's been qualified as an expert and said that's his opinion of his evaluation, so –

**{¶54}** THE COURT:  Why don't we cover the stuff that you need to cover?

**{¶55}** BY MR. DICK:

Q.  Dr. Wolfgang, you know, we've asked you about being an expert, and you've testified to your qualifications and been declared an expert.  And your evaluation, was it don't with psychological certainty?

A.  Yes.

**{¶56}** Transcript at 11.   Dr. Wolfgang then testified that the statements in his report were done with psychological certainty. He testified that appellant's prognosis was guarded to poor. We concur with appellee that even when removing the specifics that came from Dr. Wolfgang's report, his testimony supports the trial court's findings.

**{¶57}** Appellant next argues that the trial court only focused on the negative aspects of appellant, not her improvements, as testified to by Kelly Lee. Appellant notes that Lee testified that she had seen positive changes in appellant in the last two counseling sessions. However, Lee also testified that appellant had done poorly before the last two sessions.  The trial court, as trier of fact, was free to give the consider all of Lee's testimony in conjunction with the other testimony in this case.

**{¶58}** Appellant also contends that Dr. Howard Beazel and Kristine Rinehart were not called by the State as witnesses but statements attributed to them were permitted by the trial court. Appellant points out that the trial court, in paragraph 27, stated that appellant's visitation was suspended the first of July, 2017, upon the recommendations of Dr. Beazel and M.S.'s counselor, Kristine Rinehart, due to appellant's erratic behavior and/or outbursts during visitation  There was no objections to other caseworkers testifying concerning such recommendations and Ashley Labaki, on cross-examination, testified that she, along with  Dr. Beazel and another individual, had observed appellant  behaving very erratically and that they believed that it was in L.S.'s  best interest to not have visitation with appellant.

**{¶59}** Finally, appellant argues that appellant's case plan was never introduced into evidence and that, therefore, the State has not met its burden of proof. There is, however, no requirement that the case plan be introduced into evidence. Furthermore, there was testimony, as is discussed above, as to the requirements of appellant's case plan and her case plan had previously been filed in the juvenile court and was included in the record of this case. See *In re M.W.,* 9th Dist. Wayne No. 08CA0020, 2008–Ohio–4499, ¶ 21.

**{¶60}** In short, we find, upon our review of the record, that the trial court's determination that appellant had continuously and repeatedly failed to substantially remedy the issues that caused the initial removal and therefore the children could not be placed with her within a reasonable time or should not be placed with her was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence.  There was admissible evidence that appellant failed to successfully complete

substance abuse treatment, had trouble maintaining stable housing, and had not completed her case plan objectives. We further find that the trial court's decision that permanent custody to MCCS was in the children's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

**{¶61}** Appellant's sole assignment of error is, therefore, overruled.

**{¶62}** Accordingly, the judgment of the Muskingum County Court of Common Pleas, Juvenile Division, is affirmed.

By: Baldwin, J.

Gwin, P.J. and

Wise, Earle, J. concur.