[Cite as *In re M.S.*, 2025-Ohio-2644.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | | JUDGES: |
| IN RE: M.S. | : | Hon. William B. Hoffman, P.J. |
| Y.C. | : | Hon. Andrew J. King, J. |
| Y.S. | : | Hon. Kevin W. Popham, J. |
| | : | |
| | : | |
| | : | |
| | : | Case No.  24-COA-032 |
| | : | 24-COA-033 |
| | : | 24-COA-034 |
| | : | OPINION |

CHARACTER OF PROCEEDING:    Appeal from the Ashland County Court of
Common Pleas, Juvenile Division, Case
Nos.20213024;20213026;20213025

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    July 21, 2025

APPEARANCES:

For Plaintiff-Appellee    For Defendant-Appellant

CHRISTOPHER R. TUNNELL    JOSEPH P. KEARNS
Ashland County Prosecutor    P.O. Box 345
BY DREAMA KAY REESE    153 West Main Street
Assistant Prosecutor    Ashland, OH 44805
110 Cottage Street
Ashland, OH 44805
*Popham, J.,*

{¶1} Appellant-mother R.S. ["Mother"] appeals the August 23, 2024 Judgment Entry of the Ashland County Court of Common Pleas, Juvenile Division that terminated her parental rights with respect to her minor children, M.S.[1], Y.C.[2], and Y.S.[3] and granted permanent custody of the children to appellee, the Ashland County Department of Jobs and Family Services ("ACDJFS")[4]. For the reasons below, we affirm.

*Facts and Procedural History*

{¶2} R.S. is the biological mother of M.S. (b. 08-13-2013), Y.C. (b. 12-12-2011), and Y.S. (b. 04-17-2019). The father of M.S. and Y.C. is A. S-G. The father of Y.S. and a fourth child A.S. (b. 06-06-2022) is E.S.[5] Neither E.S. nor A. S-G. are U.S. citizens. 6T. at 1045. Neither speak English. *Id*. at 1072. The fathers are not parties to the Mother's appeal.

{¶3} Allegations in the Complaint concerned the minor children, M.S., Y.C., and Y.S. being left home alone. On April 14, 2021, law enforcement was called to the home, and a safety plan was initiated. While the family was participating in a safety plan with the ACDJFS, Mother tested positive for methamphetamine. Law enforcement removed the minor children pursuant to Juvenile Rule 6 on April 22, 2021. On that same day, Complaints were filed by the ACDJFS alleging M.S., Y.C. and Y.S. to be dependent under R.C. 2151.04(C).

---

[1] 5th Dist. No. 24COA032 / Ashland Juvenile Court Number 20213024
[2] 5th Dist. No. 24COA033 / Ashland Juvenile Court Number 20213026
[3] 5th Dist. No. 24COA034 / Ashland Juvenile Court Number 20213025
[4] Recognizing the heightened privacy interests of minors, we identify the parents and the minors only by their initials in accord with Sup.R. 1(A), 44(C), 44(H) and 45(D); S.Ct.Prac.R.3.12; R.C. 2303.901; Juv.R.4.
[5] A.S. is the subject of a separate, yet related permanent custody proceeding. 5th Dist. No. 24COA035 / Ashland Juvenile Court Number 20223022.

{¶4}     An Emergency Shelter care hearing was held on April 23, 2021.  [Docket Entry No. 10].  The children were placed in the temporary custody of the ACDJFS at that time.  An adjudicatory hearing was scheduled for May 19, 2021, but the hearing could not proceed because the Fathers were in need of language translation services and appointed counsel. *Judgment Entry* filed June 1, 2021.  [Docket Entry No. 21]  A Court Appointed Special Advocate ("CASA"), Emily Huestis, was appointed for the children.

{¶5}     Proposed Initial Case Plan 1.0 was filed on June 16, 2021.  [Docket Entry No. 31].  Recommendations for Mother included completing a mental health assessment and following recommendations, counseling, and remain clean and sober from drugs and alcohol.

{¶6}     At a June 16, 2021, Adjudicatory Hearing Mother stipulated to a finding of dependency.

{¶7}     A Dispositional Hearing was held July 16, 2021.  *Judgment Entry* filed Dec. 23, 2021.  [Docket Entry No. 53].  The trial court noted that Mother "is still demonstrating troubling behavior in her interactions with the [ACDJFS]," allegedly making threats and being unwilling to have "normal" conversations.  The court further noted that Mother was inconsistent with her attendance at the Ashland County Council of Alcohol and Drug Abuse ("ACCADA") for substance abuse counseling, and that she continues to test positive for THC. The court found that Mother must make advancements in parent education and mental health treatment to achieve reunification.  The court found that it is in the best interests of the minor children to remain in the temporary custody of the ACDJFS.

{¶8} The trial court received a filing from the ACDJFS dated July 16, 2021, regarding the conditions of the foster home in which the minor children were placed. *Judgment Entry,* Filed Jan. 3, 2022. [Docket Entry No. 56]. The ACDJFS did not see any immediate safety concerns that would warrant an emergency removal of the children from the foster home. However, the ACDJFS acknowledged it would be in the best interests of the minor children to be placed in a different foster home.

{¶9} Proposed Case Plan 1.01 was filed with the trial court on August 2, 2021. A Review hearing was conducted the same day. *Judgment Entry* filed Sept. 17, 2021. [Docket Entry No. 40]. The CASA, Huestis, advised the court of concerns regarding the home in which the minor children were placed. The trial court was advised that the ACDJFS can improve the home conditions, and the minor children should not endure an immediate placement disruption. An objection to proposed Case Plan 1.01 was filed by Mother on August 25, 2021. [Docket Entry No. 39].

{¶10} A Case Plan Review hearing was conducted on September 17, 2021. *Judgment Entry* filed Sept. 20, 2021. [Docket Entry No. 41]. The trial court noted that the ACDJFS had not secured translation services for the two fathers despite having temporary custody of the children since April 14, 2021. The court ordered the ACDJFS to report to the court every Friday to determine what progress the department has made in securing interpreter services on an ongoing and regular basis.

{¶11} The court further found that Mother had obtained a medical marijuana card. The court ordered any person who had a medical marijuana card to provide a copy of the card and current prescription to the ACDJFS with information about renewal, modification or termination of the card or prescription. The court further ordered that the person "shall

not" use medical marijuana within six hours preceding the time he or she will be in contact with the minor children; shall use the medical marijuana only as prescribed by his or her physician and as permitted by Ohio law; and, keep written records concerning his or her purchases of marijuana products at dispensaries in Ohio, and his or her daily use of medical marijuana. The court found that Case Plan 1.01 is in the best interest of the minor children and adopted Case Plan 1.01 as a Dispositional Order.

{¶12} A Notice of Compliance was filed by the ACDJFS with the trial court on September 31, 2021. The Notice advised that the ACDJFS has complied with the court order requiring the Department to arrange for translation services.

{¶13} Proposed Case Plan 1.02 was filed with the trial court on October 15, 2021, proposing a change in placement for the minor children and an expansion of parenting time for Mother, E.S., father of minor child Y.C, and A.S-G., father of the minor children M.S. and Y.C. [Docket Entry No. 44]. The Plan also required Mother to participate in a mental health assessment to determine any underlying mental health concerns and follow any recommendations. Further, Mother was to engage in drug/alcohol diagnostic services and follow any recommendations. The trial court adopted Case Plan 1.02 as a Dispositional Order of the court by an entry journalized on October 22, 2021.

{¶14} Proposed Case Plan 1.04 was filed with the trial court on January 25, 2022. This plan proposed a transitional plan for all the children to be transitioned back into the home of Mother. A Review hearing was conducted on March 4, 2022. The court conducted a review of Case Plan 1.04, which was approved and adopted as an Order of the court.

{¶15} Proposed Case Plan 1.07 was filed with the trial court. This case plan proposed an adjustment to the visitation between Mother and the children - to move their

then current visitation to supervised visitation in their home. Case Plan 1.07 was adopted as an Order of the court by Judgment Entry filed July 6, 2022.

{¶16} Proposed Case Plan 1.09 was filed with the trial court on August 15, 2022. The case plan proposed visitation for Mother with the minor children be changed to four hours a week unsupervised. Case Plan 1.09 was adopted as an Order of the court in a Judgment Entry filed August 30, 2022.

{¶17} A Motion to Modify Disposition was filed with the trial court on September 2, 2022. This motion sought to Modify the Disposition by terminating the previous Order placing the minor children in the temporary custody of the ACDJFS and returning the minor children to the care and legal custody of Mother, with a Protective Supervision Order. In the motion, the ACDJFS noted that Mother had completed intensive parenting education. The motion further noted that Mother allowed her medical marijuana card to expire, that she has been compliant with the Children Services drug testing program and had tested negative for all illegal drugs since March of 2022. Mother completed her substance use assessment at ACCADA with Rick Ford. There were no further treatment recommendations.

{¶18} Proposed Case Plan 1.10 was filed with the trial court on October 3, 2022. This case plan proposed the removal of Father E.S. from the case plan because he had been arrested after admitting to reports of molestation involving the minor child Y.C. The ACDJFS proposed moving the visitation for the minor children and Mother, back to supervised at the ACDJFS.

{¶19} The trial court conducted a hearing on October 3, 2022, for the purposes of an eighteen-month review, and hearing on the Motion to Modify Disposition. The

ACDJFS moved to withdraw the Motion to Modify Disposition after both Mother and stepfather of the minor children, E.S. tested positive for THC. The court was advised during the hearing that E.S. had been charged with Gross Sexual Imposition and was currently in the Ashland County Jail.  The court declined to adopt case plan 1.10 and entered a no contact order between E.S. and the minor children.

{¶20}  The trial court conducted a review hearing on December 19, 2022.  At the time of that hearing, E.S., father of Y. S., and stepfather to the other two minor children, who are the subject of these cases, was awaiting sentencing for the Gross Sexual Imposition charge.

{¶21}  ACDJFS filed a Motion for Permanent Custody with the trial court on March 17, 2023.  [Docket Entry No. 150].  The motion was heard on October 18, October 19, November 3, December 1, December 12, 2023, January 12, January 19, and January 30, 2024.

### The permanent custody hearing

### Mother's drug tests

{¶22}  Matthew Levitas, a Board-Certified Forensic Toxicologist with Forensic Fluids Laboratory, testified regarding Mother's drug testing.  1T. at 71; 77; 82; State's Exhibit 7 and 8.[6] Levitas testified that Delta-8 and Delta-9 THC are nearly identical in their chemical properties, with the only difference being a single carbon bond. *Id.* at 74. Levitas testified that the drugs are both psychoactive and impairing, with Delta-9 being stronger than Delta-8.  Levitas testified that when Delta-8 is seen in a test result it has been synthesized in a laboratory.  Levitas testified that, with such a test result, the person is

---

[6] For clarity, the transcript of Mother's permanent custody hearing will be referred to as "__T.__" signifying the volume and page number.

not smoking a joint, but rather is usually ingesting pure Delta-8 THC.  Levitas testified that Delta-8 THC can be purchase legally at gas stations. *Id*. at 111.

**{¶23}**  Levitas testified that on November 10, 2022, Mother tested positive for amphetamine at 43.9 nanograms per milliliter and methamphetamine at 95.7 nanograms per milliliter. 1T. at 97.  Levitas testified that the medication Wellbutrin would not cause a positive test result for methamphetamine because the two have different chemical structures.  *Id.* Levitas testified that the levels were a relatively low concentration. *Id*. at 84.  Levitas further testified that amphetamine is a metabolite of methamphetamine. Levitas testified that when the body breaks down methamphetamine, it creates amphetamine, therefore, it is very typical to see those two drugs together.  *Id*. at 85.

**{¶24}**  Levitas testified that on November 17, 2022, Mother tested positive for amphetamine at 72.4 nanograms per milliliter and methamphetamine at 290.7 nanograms per milliliter. 1T. at 96.

**{¶25}**  Levitas testified that on December 16, 2022, Mother tested positive for amphetamine at 26.0 nanograms per milliliter and methamphetamine at 33.6 nanograms per milliliter. 1T. at 95.  Levitas testified Mother further tested positive for Delta-9 THC at a concentration greater than 500 nanograms per milliliter. 1T. at 95.  Levitas testified that none of the medications Mother was taking by prescription would yield a false positive test for methamphetamine.  *Id.* Levitas further testified the reason for the high level noted in the THC testing result is that the person smoked marijuana a short time before the sample was taken. *Id.* at 92.

**{¶26}**  Levitas testified that on January 11, 2023, Mother tested positive for Delta-9 THC at a concentration of 6.8 nanograms per milliliter. 1T. at 94.

{¶27} Levitas testified that on January 25, 2023, Mother tested positive for Delta-9 THC at a concentration of 26.4 nanograms per milliliter. 1T. at 94.

{¶28} Levitas testified that on February 15, 2023, Mother tested positive for Delta-9 THC at a concentration of 1.7 nanograms per milliliter. 1T. at 93.

{¶29} Levitas testified that on February 24, 2023, Mother tested positive for amphetamine at 166.7 nanograms per milliliter and methamphetamine at 822.2 nanograms per milliliter. 1T. at 92. Levitas testified that Mother also tested positive for Delta-9 THC at a concentration greater than 500 nanograms per milliliter.

{¶30} Levitas testified that on February 27, 2023, Mother tested positive for amphetamine at 33.7 nanograms per milliliter and methamphetamine at 49.6 nanograms per milliliter. 1T. at 91. Levitas testified that Mother further tested positive for Delta-9 THC at a concentration of 110.6 nanograms per milliliter.

{¶31} Levitas testified that on March 8, 2023, Mother tested positive for Delta-9 THC at a concentration of 19.6 nanograms per milliliter. 1T. at 89.

{¶32} Levitas testified that on March 10, 2023, Mother tested positive for Delta-9 THC at a concentration of 17.2 nanograms per milliliter. 1T. at 89.

{¶33} Levitas testified that on March 29, 2023, Mother tested positive for amphetamine at 41.7 nanograms per milliliter and methamphetamine at 110.0 nanograms per milliliter. 1T. at 88. Levitas also testified that Mother tested positive for Delta-9 THC at a concentration of 30.8 nanograms per milliliter.

{¶34} Levitas testified that on June 7, 2023, Mother tested positive for Delta-9 THC at 4.0 nanograms per milliliter. Levitas testified that the report notes Mother has a medical marijuana card. *Id.* at 87.

{¶35} Levitas testified that on June 14, 2023, Mother tested positive for amphetamine at 25.6 nanograms per milliliter and methamphetamine at 26.9 nanograms per milliliter. 1T. at 83. Levitas testified that Mother also tested positive for Delta-9 THC at a concentration of 6.2 nanograms per milliliter. Levitas testified that it was reported Mother had a medical marijuana card at that time. 1T. at 85.

{¶36} Levitas testified that the laboratory verifies positive test results using LC-MS/MS technology. 1T. at 101. Levitas testified that this is done to confirm there is a positive test result, or to make sure the result is a true and accurate positive. *Id.* Levitas testified that the molecular fingerprint of Delta-8 THC is different than Delta-9 THC. 1T. at 73. Levitas testified that the mass spectrometer used for testing can differentiate between the two substances. *Id.* at 74.

*Mother's Substance Abuse Treatment*

{¶37} Mother was referred to Mary Jo Janchar, a substance abuse counselor with ACCADA, in June 2021. 1T. at 140. Marijuana, alcohol, and methamphetamines were the reported concerns. Janchar met with Mother to complete a substance abuse assessment. Janchar testified that Mother was diagnosed with cannabis dependence and alcohol dependence. 1T. at 142-143. Janchar testified that Mother self-reported the alcohol and marijuana problems but consistently denied using methamphetamines. *Id*. at 143; 159. Janchar testified that Mother further reported smoking marijuana since the age of thirteen. *Id.* at 159.

{¶38} Janchar testified that Mother also reported that she had a medical marijuana card for post-traumatic stress disorder and anxiety. Janchar testified that Mother reported using ninety-five percent THC known as "shatter." *Id.* Janac testified that on July 29,

2021, Mother drove to her appointment; however, Mother appeared to be under the influence. Janchar testified that, when asked, Mother reported that she had used "shatter" for anxiety. 1T. at 149-150. When asked if someone could pick her up, Mother left the office.

{¶39} Janac testified she was unable to develop a treatment plan for mother. 1T. at 147. Janchar testified that Mother was a no-show, or canceled, five out of ten scheduled appointments. Janchar testified that Mother became agitated when the subject of her husband's drinking in the home was broached. *Id.* at 148. Janchar testified that Mother indicated she was more comfortable with doing her services at Appleseed. *Id.* Accordingly, treatment with ACCADA was stopped. *Id.* at 149.

*Mother's Mental Health Treatment*

{¶40} Christine Myers, a Licensed Professional Counselor with Appleseed worked with Mother from January 2021 through September 2022. 1T. at 166. Myers testified that she conducted a mental health assessment of Mother in January 2021. Myers testified that she diagnosed Mother with post-traumatic stress disorder, major depressive disorder, and generalized anxiety disorder. *Id.* at 168. Myers testified that Mother was also treated by Dr. Roy Vellanki, a psychiatrist, whom Mother saw every three months for medication management. *Id.* at 171. Myers testified that Mother was prescribed Vistaril, Trazodone, Effexor, and Topamax. *Id.* at 172. Myers testified that she would not recommend taking marijuana with the prescribed medications. *Id.* at 177. Myers testified that Mother was also using alcohol on a regular basis. *Id.* at 176.

{¶41} Myers testified Mother made progress in treatment while she was pregnant with A.S., who was born June 6, 2022.[7] 1T. at 173-174. Myers testified that Mother reported that she had stopped using marijuana during that time. *Id.* at 175-176; 198.

{¶42} Myers testified that Mother stopped attending treatment in September 2022. 1T. at 174; 190. Myers further testified that attempts were made in May 2023 to engage Mother in family counseling with her children. 1T. at 178. Myers testified that Mother appeared in the office on May 1, 2023, but left without checking in for the appointment. *Id.*

*ACDJFS Involvement*

{¶43} Carla Wilkinson, the ongoing caseworker for ACDJFS was assigned Mother's case on September 23, 2022. 3T. at 513. Wilkinson testified that there have been approximately six different caseworkers assigned to the case. 3T. at 668-669.

{¶44} Wilkinson testified the initial concerns reported in April 2021 were that the children were left alone while Mother took her husband to work. The oldest child at that time was nine years old; the youngest had just turned two. *Id.* at 515. Additional concerns were that the children did not have access to a telephone or cell phone in the event of an emergency, and the home had no working smoke detectors.

{¶45} Wilkinson testified that while the family was participating in a safety plan with the ACDJFS, Mother tested positive for methamphetamine, and law enforcement removed the minor children on April 22, 2021. *Id.* at 516. Wilkinson testified that Mother admitted at that time that she was not emotionally well, that she was a recovering alcoholic, and that she was self-medicating with THC. Wilkinson testified that it was

---

[7] A.S. in the subject of a separate permanent custody case, 5th Dist. No. 24COA035 / Ashland Juvenile Court Number 20223022.

reported that Mother appeared almost manic at times. Wilkinson testified that from the time of their removal on April 22, 2021, until the date of her testimony on November 3, 2023, the children have continuously been in the custody of the ACDJFS. *Id*. at 518.

{¶46} Wilkinson testified that a Case Plan was developed that included drug, alcohol and mental health assessments and counseling, parenting services, monthly drug screens, and home visits by the ACDJFS. 3T. at 524.

{¶47} Wilkinson testified that Mother completed a drug and alcohol assessment through ACCADA in May 2022. 3T. at 525. Wilkinson testified that there were no recommendations for further services as a result of that assessment. *Id.* Wilkinson testified that Mother did nothing further until July 2023.

{¶48} Wilkinson testified that Mother reported to ACDJFS that her positive methamphetamine tests were because she was taking Wellbutrin. 3T. at 528-529. Wilkinson testified that Mother never admitted to using methamphetamine. *Id.* at 529. Wilkinson testified that Mother was not in a substance abuse program from July 2021 to July 2023. *Id.*

{¶49} Wilkinson testified that in July 2023, Mother reportedly contacted Affect Therapeutics concerning drug and alcohol treatment. 3T. at 530-531. It was reported that Affect Therapeutics is a virtual service. Drug testing was done at home during a video chat with her counselor. *Id.* During this time it was reported that Mother was in a physical altercation with her paramour, F.C. 3T. at 536. Wilkinson testified that Mother declined domestic violence services through Affect and the ACDJFS. Wilkinson testified that Mother was terminated from the Affect Therapeutics program for non-attendance. 3T. at

537. Wilkinson testified that Mother has not successfully completed any substance abuse services.

{¶50} Wilkinson testified that, beginning in July 2022, Mother was enrolled in Forensic Fluids Drug Testing Randomization Program. 3T. at 540. She would call into a number each morning to see if her color had been called for that day, and if it had, she would need to appear within a certain period of time for a drug screen. *Id*. at 541. Wilkinson testified that Mother appeared for testing only five of the fourteen times[8] that she was required to appear. *Id*. at 542.

{¶51} Wilkinson testified Mother would also be screened for drug usage during in-home visits by the ACDJFS and before visitations with the children. *Id.* at 543. The last time Mother appeared for a randomized drug screen was March 2023. Wilkinson testified that Mother was not tested by anyone for drugs from April to May 17, 2023, and during the entire month of September 2023. *Id*. at 544.

{¶52} Wilkinson testified Mother obtained a medical marijuana card in July 2021. Mother allowed the card to lapse in July 2022. 3T. at 544. Mother renewed the card in November 2022. *Id.* at 545. Wilkinson testified that Mother tested positive for THC three to five times during the time she did not have a current medical marijuana card. Wilkinson testified that Mother signed a release for a company reported by Mother to have issued the referral for the medical marijuana card; however, when contacted by the ACDJFS, the company stated that they did not know Mother. *Id.* at 546.

---

[8] We note that in Ashland County Court of Common Pleas, Juvenile Division, Case No. 20223022, Wilkinson testified that Mother appeared for drug testing only five of the seventeen times that she was required to appear.

{¶53} Wilkinson testified Mother has not been engaged in mental health services since September 2022. 3T. at 550.

{¶54} Wilkinson testified Mother told her that she was taking herself off her prescription medication and was going to self-medicate with high levels of THC. 3T. at 551-552. Wilkinson testified that it was during this time that Mother renewed her medical marijuana card in November 2022.

{¶55} Wilkinson also testified that on July 5, 2021, Mother was arrested for driving with a suspended driver's license and obstructing official business. Mother was allegedly fighting with the officer trying to arrest her for the driving under suspension charge, jumped into her car in an attempt to keep the car from being towed, and attempted to kick out a window in the police cruiser. 3T. at 561-563; State's Exhibit 2. Wilkinson testified that Mother pled no contest. Mother was sentenced to ten days jail time, 170 days suspended jail time, one hundred hours of community service, ordered to refrain from drug or alcohol use, and pay a $250.00 fine and court costs. Wilkinson testified that Mother successfully completed her sentence and her probation. *Id*. at 564-565. Wilkinson testified that Mother has obtained a valid driver's license. 3T. at 587.

{¶56} Wilkinson testified Mother did successfully complete parenting classes through Advocates for Families. *Id.* at 566.

{¶57} Wilkinson testified the ACDJFS was not able to conduct home visits with Mother at her apartment in April, May, June, September, and October 2023 because Mother was not home or did not answer the door. 3T. at 574.

{¶58} Wilkinson testified Mother is employed working third shift on a line assembling weed whackers[9]. 3T. at 585. Wilkinson testified that Mother's three-bedroom apartment is paid for with a voucher, and the lease was set to expire in February 2024. 3T. at 571.

{¶59} Wilkinson testified family counseling with the children began in September 2023 with Chris Lewis at Appleseed. 3T. at 607. Two sessions took place during visitations.

{¶60} Wilkinson testified the ACDJFS filed a Motion on September 2, 2022, to terminate the temporary custody granted to the Department and return legal custody, with protective supervision, to Mother. 3T. at 609; 5T. at 845. Wilkinson testified that, at that time, Mother had five months of negative drug screens. However, during the first unsupervised home visit, Mother and father/stepfather E.S. took the children out to dinner. Wilkinson testified that E.S. had a beer and was reported to be drinking in the car while Mother was driving. Wilkinson testified that E.S. tested positive for THC. Wilkinson testified that the visits were moved back to supervised visits.

{¶61} Wilkinson testified the ACDJFS moved to withdraw their Motion to Modify Disposition after both Mother and E.S. tested positive for THC, and it was further alleged that E.S had been charged with Gross Sexual Imposition and was currently in the Ashland County Jail. 3T. at 612; 5T. at 848. Wilkinson testified that Mother continued to have telephone contact with E.S. at least forty-nine times between January and March of 2023. *Id.* at 619.

*Mother's Testimony*

---

[9] Mother's testimony regarding her employment is slightly different. See paragraph 70 below.

{¶62} Mother testified that she had been sexually abused as a child. 6T. at 991. Mother testified that she has been self-medicating with marijuana since age 13. *Id.* at 993. She claimed it does not affect her; it helps her stay focused and calm. Mother testified that she was prescribed Effexor, Zoloft, Wellbutrin, and Topamax. *Id.* at 994. Dr. Vellanki, from Appleseed, prescribed the medications for mood swings, depression, and migraines. *Id.* at 996. Mother testified she was prescribed Wellbutrin to help her quit smoking. *Id.* at 995. Mother testified to stopping all her prescribed medications between November 2022 and January 2023. *Id.* Mother testified that she has not seen Dr. Vellanki, nor has she participated in any mental health counseling, since September 2022. *Id.* at 996. Mother testified that she does not believe she needs mental health counseling. *Id.* at 1049.

{¶63} Mother testified she obtained a medical marijuana card because she was testing positive for THC, and her caseworker advised her to obtain one. 6T. at 998. Mother testified that when she ingested Delta-8 she would feel the same as if "I were to take a couple hits off of a bowl or smoke a dube." 6T. at 1001. Mother testified that she has never used methamphetamines. *Id.* at 1003. Mother testified she will continue to use Delta-8, even though Delta-9 is now legal in Ohio. *Id.* Mother also testified that she allowed her medical marijuana card to lapse, because it makes no sense to pay $300.00 for a card when she can legally buy marijuana over-the counter now. Mother testified that she used Delta-8 the night before her testimony. 7T. at 1194. Mother testified that she uses the substance once or twice per day, every day. *Id.*

{¶64} Mother testified that her actions during the arrest for obstructing official business and driving under suspension were the result of withdrawing from her prescribed

medications. *Id.* at 1005. Mother testified that she had a "PTSD blackout after she advised [the officer] that she was on her way home to take her medicine." *Id.* at 1142; 7T. at 1181. Mother testified that she was given a drug test at the police station that tested negative for drugs, even THC. Mother testified that she does have blackouts. 7T. at 1182. Mother testified that the last time she used alcohol was the day the ACDJFS took her kids. 6T. at 1007.

{¶65} Mother testified to leaving the children alone as she earned money working for Door Dash, giving people rides, and taking E.S. to work. *Id.* at 986-989. Mother further testified to leaving the children with her sister in Tennessee while she and A.S-G. attempted to work on their marital problems. 7T. at 1199-1200; 1230-1232; 1234. Mother testified this was like a summer vacation for the children. *Id.* at 1232.

{¶66} Mother testified she was unaware that E.S. had inappropriately touched Y.C. 6T. at 990; 1019. Mother testified that no one told her what conduct the gross sexual conduct allegations concerned. *Id.* at 1021. Mother testified that she took E.S.'s calls from the jail because she was financially dependent on his family for rent, utilities, food, and gas. *Id.* at 1023. Mother testified that when she ceased contact with E.S., the support stopped. *Id.* Mother testified that the children found out about Mother taking E.S.'s phone calls because they were told by the CASA worker and the children's foster parents. *Id.* at 1026. Mother testified that she believed that the CASA worker and the previous foster parents, the Hernandez's, spoke to the children about the Hernandez's adopting the children. *Id.* at 1052-1054.

{¶67} Mother testified that she had filed for divorce from E.S.; however, she overslept and missed the court date resulting in the case being dismissed. *Id.* at 1042;

1139. Mother further testified that she has another child from her first marriage. 6T. at 1075-1076; 1132-1133. Mother testified that she agreed to sign over custody of the child to his father. *Id.* at 1133. Mother testified that the child lives in Louisiana with his father. *Id.*

{¶68} Mother testified that her paramour, F.C., hit her, leaving a mark on her face. 6T. at 1095. She agreed that she refused any referrals for domestic violence services. *Id.* at 1096. Mother testified that A.S-G. was physical with her during their relationship. *Id.* at 1126-1128. Mother testified that her first husband and father of their child was abusive toward her. *Id.* at 1133. In all, Mother testified that she has had abusive relationships with four different men over the years. 7T. at 1184. Mother testified that she does not see her mental health as having anything to do with that pattern. *Id.* Mother further testified that when she was younger, she engaged in cutting herself, and now her oldest child is engaging in similar behavior. *Id.* at 1185.

{¶69} Mother testified that she had eleven positive tests for methamphetamines during the case; however, she denied ever using the drug. *Id.* at 1098-1101. Mother further testified that the positive THC test results while she was pregnant with A.S. were false positives. *Id.* at 1102.[10] Mother testified that she missed her last visit with the children because she did not have transportation. 6T. at 1036.

{¶70} Mother testified that she is employed at Speed North America making a weed whacker line, working Monday through Friday, with weekends optional. 6T. at 1029. She testified that her employer would help her find childcare, and that she has a friend that can help. 6T. at 1045-46.

---

[10] February 16, 2022, and March 7, 2022.

*The Court Appointed Special Advocate's Testimony- Emily Huestis*

{¶71}  Huestis testified that she recommends that Y.C. and M.S. be placed in the custody of their father, A.S-G. 7T. at 1245.  Further, Huestis testified that she recommends Y.C.'s last name be changed to that of her father.  *Id.* She also recommends that Y.C. and M.S. begin extended unsupervised visits with their father.

{¶72}  Huestis testified that she has no concerns with the fact the Father speaks Spanish and the children do not.  *Id*. at 1264.  Huestis testified that the ACDJFS asked A. S-G. whether if he would agree to allow his children to be adopted if he were allowed to have regular visitation.  *Id.* at 1265.  Huestis testified that it is not legally possible to continue visitation after parental rights are terminated.  *Id*. at 1265-1267; 1284-1285.  Huestis testified that she believes the ACDJFS failed to seriously consider A. S-G. for reunification due to his immigration status. 7T. at 1272-1273.  Huestis testified that, due to the backlog of cases, and with advance notice to the person, deportation is a lengthy process.  *Id.* at 1276-1277.

{¶73}  Huestis testified that she told the children that Mother had tested positive for drugs. 7T. at 1354.  She admitted that she never observed Mother hit her children. *Id.* at 1381-1382.

{¶74}  Huestis testified that she recommends that permanent custody of Y.S. be granted to the ACDJFS, with placement remaining with the current foster parents. 7T. at 1245*.* Huestis testified she further recommends that Mother's parental rights to all three children be terminated.  *Id.* at 1246.

*The Children*

{¶75} A Review hearing was held on August 2, 2021, addressing cleanliness issues of the foster home where the children were placed. While not an emergency, the children were later removed and placed into another home. The children were ultimately placed into three different foster homes over the course of the case, due to cleanliness issues with the first foster care placement, and later alienation concerns with the second placement. At the last placement, there was a concern with a broken arm of the child, Y.S., but abuse was not proven.

*The Trial Court's Decision*

{¶76} By Judgment Entry filed August 23, 2024, the trial court issued findings of fact granting permanent custody of the children to the ACDJFS. Specifically, the trial court found that the children have been in the temporary custody of the ACDJFS for twelve months out of a consecutive twenty-two month period as of the filing of the Motion for Permanent Custody, and also, that, by clear and convincing evidence, the minor children cannot or should not be placed with Mother of the minor children because she failed to remedy the problems which resulted in the initial removal of the children. The court cited concerns with Mother's self-medicating with illegal drugs, her erratic and unstable behavior, and leaving the children unsupervised. The court noted that Mother continued to self-medicate with illegal drugs, as evidenced by positive drug screens, and that she has been non-compliant with case plan services and case management requirements designed to allow her to resume and maintain parental duties. Further, the court found that granting permanent custody to the ACDJFS was in the best interests of the children.

*Assignment of Error*

{¶77} Mother raises one assignment of error,

{¶78} "I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED PERMANENT CUSTODY OF THE CHILDREN TO THE ASHLAND COUNTY DEPARTMENT OF JOBS AND FAMILY SERVICES."

I.

{¶79} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), *quoting Stanley v. Illinois*, 405 U.S. 645 (1972). A parent's interest in the care, custody, and management of his or her child is "fundamental." *Id*.; *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The permanent termination of a parent's rights has been described as "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith,* 77 Ohio App.3d 1, 16 (6th Dist. 1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id*. An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1).

**Standard of Review**

{¶80} The Supreme Court of Ohio has delineated our standard of review as follows, "the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *In re: Z.C.,* 2023-Ohio-4703, ¶18.

{¶81} Mother challenges both the sufficiency and the manifest weight of the evidence.

*Sufficiency of the Evidence*

{¶82} Sufficiency of the evidence is a question of law reviewed de novo. *State v. Walker*, 2016-Ohio-8295, ¶ 30; *State v. Jordan*, 2023-Ohio-3800, ¶ 13.

{¶83} "'[S]ufficiency is a test of adequacy.'" *In re Z.C.* at ¶ 13, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997) *superseded by constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 n.4 (1997).* "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the [factfinder's determination] as a matter of law." (Cleaned up.) *In re Z.C.* at ¶ 13.

{¶84} The Supreme Court of Ohio held that where the degree of proof required to sustain an issue must be "clear and convincing" means "[t]he measures or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104 (1986); *Accord, In re: Z.C.*, 2023-Ohio-4703, ¶7. A court of appeals will examine the record to determine whether the judge had sufficient evidence before it by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. 2023-Ohio-4703, ¶8; *In re Adkins*, 2006-Ohio-431, ¶17 (5th Dist.); *In re L.A.,* 2024-Ohio-3436, ¶59 (5th Dist.).

*Manifest Weight*

{¶85}   The term **"manifest weight of the evidence"** relates to persuasion.  *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.  It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387; *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶86}  When reviewing the manifest weight of the evidence, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient.  *Thompkins*, 78 Ohio St.3d at 386 - 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001).  In this role, an appellate court acts as a "thirteenth juror" and may disagree with the jury's assessment of conflicting testimony.  *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982); *State v. Wilson*, 2007-Ohio-2202, ¶ 25.

{¶87}  Appellate courts traditionally presume the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical factors in evaluating credibility.   *Eastley*,  2012-Ohio-2179,  ¶  21;  *Seasons  Coal  Co.,  Inc.  v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶88}  However, the Eighth District Court of Appeals recently noted in *State v. Reillo*, 2024-Ohio-3307, ¶ 20, *appeal allowed,* 2025-Ohio-705 (Table), that *Eastley* arguably extended this presumption from civil to criminal cases.  *Id.* at ¶ 27.  The court cautioned that deferring to credibility determinations would collapse the distinction between sufficiency and weight of the evidence.  *Reillo* at ¶ 23.  It observed that if credibility findings were insulated from review, there would be little reason to raise a

manifest-weight challenge. *Id. See also State v. Butler*, 2024-Ohio-5879, ¶ 27 (5th Dist.). Thus, acting as a thirteenth juror, the appellate court reviews credibility de novo. *Id.*

**{¶89}** A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### Requirements for Permanent Custody Awards

**{¶90}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶91}** Following the hearing, R.C. 2151.414(B)(1) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in

another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶92} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

## Temporary Custody For at Least Twelve Out of a Consecutive 22-month Period-R.C. 2151.414(B)(1)(d).

{¶93} The "12 of 22" provisions set forth in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents

against the importance of a speedy resolution of the custody of a child. *In re C.W.,* 2004-Ohio-6411, ¶22. Through the "12 of 22" provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds. *Id.*

{¶94} "Before a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22-month period." *In re: C.W.,* 2004-Ohio-6411 at paragraph one of the syllabus. When calculating this period, the Court in *C.W.* cautioned, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." 2004-Ohio-6411, ¶26.

{¶95} R.C. 2151.414(B)(1)(e) states that, "[f]or the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

{¶96} As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 2007-Ohio-5805 (5th Dist.); *In re: K.C.,* 2024-Ohio-2081, ¶45 (10th Dist.). This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 2008-Ohio-5458 (5th Dist.) *In re: K.C.,* 2024-Ohio-2081, ¶45 (10th Dist.).

{¶97} Mother has not challenged that the children had been in the temporary custody of the ACDJFS for over twelve months of a consecutive 22-month period at the time the motion for permanent custody was filed. Because Mother has not challenged the twelve of twenty-two-month finding as to the children, we would only need to address the best interest of the children pursuant to R.C. 2151.414(D).

{¶98} However, the trial court also found that R.C. 2151.414(B)(1)(a) was applicable. Even if we consider this argument, the trial court did not err in determining the children cannot be placed with Mother at this time or within a reasonable time.

### Parental Placement within a Reasonable Time– R.C. 2151.414(B)(1)(a)

{¶99} The trial court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1) - (15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S*., 75 Ohio St.3d 95 (1996); *In re Hurlow*, 1997 WL 701328 (4th Dist. Sept. 21, 1998); *In re Butcher,* 1991 WL 62145 (4th Dist. Apr. 10, 1991).

{¶100} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or

should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to

the parents for changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

…

(16) Any other factor the court considers relevant.

{¶101} The trial court found that the ACDJFS had made reasonable efforts to prevent the removal, to eliminate the continued removal, or to make it possible for the children to return home safely to Mother's home. The record supports the court's finding that Mother has not shown consistent, sustained progress to have the children returned to her custody.

{¶102} It does not appear that Mother has been able to apply any behavioral changes that she has attempted to learn. Despite being offered numerous services, Mother was unable or unwilling to mitigate the concerns that led to the children's removal. As set forth in our *Facts and Procedural History, supra*, we find there was sufficient and substantial competent evidence Mother failed to remedy the problems which initially caused the removal of the children from her home.

{¶103} Despite being diagnosed with significant mental health problems, Mother rejected the help she was offered. The record clearly shows that Mother would prefer to self-medicate with Delta-8 and Delta-9 rather than remain on medications prescribed by her health care professionals. Despite suffering trauma in her own childhood and continually entering abusive relationships, Mother has rejected all attempts to engage in counseling and other programs to learn to overcome her problems and live a drug free life. She does not believe that she has a substance abuse problem, or that she is in need of mental health services.

{¶104} The ultimate question under R.C. 2151.414(A)(1) is whether the parent has substantially remedied the conditions that caused the child's removal. A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed—the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency. *In re J.L.,* 2004-Ohio-6024, ¶ 20 (8th Dist.); *In re Mraz,* 2002–Ohio–7278 (12th Dist.). In the case of *In re: Summerfield,* 2005-Ohio-5523 (5th Dist.), this Court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time. *Accord, In re: K.C.,* 2024-Ohio-2081, ¶56 (10th Dist.).

{¶105} No doubt, Mother loves and is bonded with her children. However, the evidence demonstrates that Mother made very few successful efforts on the case plan. On that point, the evidence further demonstrates that any improvement Mother has made

in her life is tentative and, perhaps, temporary, and that she is at risk of relapse. The trial court found that Mother is not able to be a successful parent to the children. Mother has made virtually no progress in the three years this case has been open. Nothing in the record indicates that, given more time, Mother will make a sincere and successful effort to remedy the problems.

{¶106} We find there is competent and credible evidence, which, if believed, would convince the average mind that the children cannot be placed with Mother within a reasonable time or should not be placed with Mother.

**The Best Interest of the Children**

{¶107} An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.,* 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26.

{¶108} R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent custody motion. These factors include but are not limited to: (a) the interrelationship of the child with others; (b) the wishes of the child; (c) the custodial history of the child; (d) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) apply.

{¶109} The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent withholding medical treatment or food from the child;

a parent repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent abandoning the child; and a parent having had parental rights as to the child's sibling involuntarily terminated.

{¶110} No one element is given greater weight or heightened significance. *In re C.F.,* 2007-Ohio-1104. R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision or judgment entry a written discussion of each of those factors. *In re: A.M.,* 2020-Ohio-5102, ¶33.

{¶111} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 2000 WL 1700073 (5th Dist. Nov. 13, 2000), *citing in re Awkal,* 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶112} In the case at bar, the ACDJFS investigated potential placement with relatives and found none to be suitable. Considering the many obstacles in Mother's life, the trial court found the children's need for a legally secure placement cannot be achieved without awarding permanent custody to the ACDJFS. Nothing in the record before us demonstrates that more time, or a return of custody to the Mother, will in any way benefit the children. This case has been ongoing for over three years.

{¶113} Here, the trial court concluded the children's need for legally secure placement could not be achieved without awarding permanent custody to the ACDJFS.

Upon review, the record supports the trial court's finding that granting the motion for permanent custody is in the children's best interest.

{¶114} In short, the trial court's judgment entry demonstrates that the court satisfied its statutory duty to consider the best interest factors set out in R.C. 2151.414(D)(1)(a) through (e).

**Conclusion**

{¶115} For these reasons, we find that the trial court correctly found that the children had been in the temporary custody of the ACDJFS for over twelve months of a consecutive 22-month period.

{¶116} We further find the trial court's determination that Mother had failed to remedy the issues that caused the initial removal, and, therefore, the children could not be placed with her within a reasonable time or should not be placed with her, was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶117} We further find that the trial court's decision that permanent custody to the ACDJFS was in the children's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶118} Because the evidence in the record supports the trial court's judgment, we overrule Appellant-Mother's assignment of error and affirm the decision of the Ashland County Court of Common Pleas, Juvenile Division.

By Popham, J.,

King, J., concur;

Hoffman, P.J., concurs

separately

*Hoffman, P.J., concurring*

**{¶119}** I concur in the majority's thorough and well written opinion with one single exception.

**{¶120}** The majority holds an appellate court reviews credibility de novo under a manifest weight of evidence argument. (Maj. Op. at ¶88). I do not believe that is the appropriate standard of review. When reviewing issues de novo (e.g., statutes, summary judgments, contracts, etc.), no deference need be given to the trial court's decision. The majority opinion recognizes appellate courts traditionally presume the trier-of-fact's assessment of conflicting testimony is correct, given its ability to observe witnesses' demeanor, gestures and tone as critical factors in evaluating credibility. Yet it holds review of credibility is de novo, which I maintain is non-deferential. This seems inherently contradictory to me and I remain unpersuaded such is the appropriate standard of review.